06-4216-cv
Arar v. Ashcroft et al.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: November 9, 2007

Decided: June 30, 2008
Errata Filed: August 1, 2008)

Docket No. 06-4216-cv

MAHER ARAR,

> *Plaintiff-Appellant*,

> v.

JOHN ASHCROFT, formerly Attorney General of the United States; LARRY D. THOMPSON, formerly Deputy Attorney General; TOM RIDGE, as Secretary of State of Homeland Security; J. SCOTT BLACKMAN, as Regional Director of the Regional Office of Immigration and Naturalization Services; PAULA CORRIGAN, Regional Director of Immigration and Customs Enforcement; EDWARD J. MCELROY, formerly District Director of Immigration and Naturalization Services for New York District, and now Customs Enforcement; ROBERT MUELLER, Director of the Federal Bureau of Investigation; JOHN DOE 1-10, Federal Bureau of Investigation and/or Immigration and Naturalization Service Agents; JAMES W. ZIGLAR, formerly Commissioner for Immigration and Naturalization Services; UNITED STATES OF AMERICA,

> *Defendants-Appellees.*

Before: MCLAUGHLIN, CABRANES, and SACK, *Circuit Judges*.

Plaintiff, a dual citizen of Syria and Canada, who alleges that he was mistreated by U.S. officials in the United States and removed to Syria with the knowledge or intention that Syrian authorities would interrogate him under torture, brought an action against the United States and various U.S. officials pursuant to the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA"), and the Fifth Amendment to the U.S. Constitution. Defendants moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, and several of the individual defendants also moved to dismiss the complaint for lack of personal jurisdiction. In

1

addition, the United States asserted the state-secrets privilege with respect to information at the core of plaintiff's claims. The United States District Court for the Eastern District of New York (David G. Trager, *Judge*) granted defendants' motion to dismiss without reaching the issues raised by the assertion of the state-secrets privilege by the United States. We likewise evaluate the claims presented under applicable law and because those claims do not survive that review, we do not consider whether the assertion of the state-secrets privilege by the United States compels the dismissal of this action; nor need we determine on this appeal whether, as defendants contend, the Immigration and Nationality Act forecloses the litigation in federal district court of plaintiff's removal-related claims. With respect to the other jurisdictional questions raised on this appeal, we conclude that (1) the allegations set forth in plaintiff's complaint are sufficient, at this early stage of the litigation, to establish personal jurisdiction over defendants not resident in New York, but (2) plaintiff has not established federal subject matter jurisdiction over his claim for declaratory relief. Furthermore, we hold that (3) plaintiff's allegations do not state a claim against defendants for damages under the TVPA and (4) in light of the determinations of Congress and precedents of the Supreme Court and our Court, we cannot judicially create a cause of action for damages under the Fifth Amendment, for plaintiff, pursuant to the doctrine of *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

Affirmed. Judge Sack concurs in part and dissents in part in a separate opinion.

> DAVID COLE, Center for Constitutional Rights, New York, N.Y. (Katherine Gallagher, William Goodman, Maria Couri LaHood, Jules Lobel, Barbara Olshansky, Center for Constitutional Rights, New York, NY, Joshua S. Sohn. Robert Fink, Stanley McDermott III, Sarah J. Sterken, DLA Piper U.S. LLP, New York, NY, *on the brief*), *for Plaintiff-Appellant Maher Arar.*

> DENNIS BARGHAAN, Assistant United States Attorney (Chuck Rosenberg, United States Attorney*, Larry Gregg, R. Joseph Sher, Assistant United States Attorneys, *on the brief*), United States Attorney's Office for the Eastern District of Virginia, Alexandria, VA, *for Defendant-Appellee John Ashcroft.*

2

JAMIE KILBERG (John J. Cassidy, Stephen L. Braga, Jeffrey A. Lamken, Allyson N. Ho, Stephanie R. Dourado, *on the brief*), Baker Botts LLP, Washington, DC, *for Defendant-Appellee Larry Thompson.*

JEFFREY BUCHOLZ, Principal Deputy Assistant Attorney General, (Peter J. Keisler, Assistant Attorney General, Rosylnn R. Mauskopf, United States Attorney, Eastern District of New York, Barbara L. Herwig, Robert M. Loeb, Mary Hampton Mason, Jeremy S. Brumbelow, *on the brief*), United States Department of Justice, Washington, DC, *for Official Capacity Defendants-Appellees and for Amicus Curiae the United States of America.*

Shveta Kakar, (Jeremy Maltby, Margaret L. Carter, George James Bagnall V), O'Melveny & Myers LLP, Los Angeles, CA and New York, NY, *for Defendant-Appellee Robert S. Mueller III.*

Thomas G. Roth, West Orange, NJ, *for Defendant-Appellee J. Scott Blackman.*

Thomas M. Sullivan (Debra L. Roth *on the brief*), Shaw, Bransford, Veilleux & Roth, P.C., Washington, DC, *for Defendant-Appellee Edward J. McElroy.*

William A. McDaniel, Jr. (Bassel Bakhos, *on the brief*), Baltimore, Maryland, *for Defendant-Appellee James W. Ziglar.*

Sidney S. Rosdeitcher, Paul, Weiss, Rifkind, Wharton & Garrison LLP (Jonathan Hafetz*, Brennan Center for Justice at New York University School of Law*, on the brief*), New York, NY, *for Amicus Curiae Retired Federal Judges, supporting Plaintiff-Appellant.*

Nancy Morawetz, New York University School of Law, New York, NY, *for Amicus Curiae U.S. and Canadian Scholars, supporting Plaintiff-Appellant.*

Bridget Arimond, Center for International Human Rights, Northwestern University School of Law, Chicago, IL, *for Amicus Curiae Center for International Human Rights of Northwestern University School of Law, supporting Plaintiff-Appellant.*

Kristine A. Huskey (Akbar Siddiqui, Sabrina Balgamwalla, *of*

*counsel*),[*] International Human Rights Law Clinic, American University Washington College of Law, *for Amicus Curiae Center for Justice and Accountability*, International Federation for Human Rights, Minnesota Advocates for Human Rights, World Organization Against Torture, *supporting Plaintiff-Appellant*.

Baher Azmy (Jenny-Brooke Condon, Meetali Jain, Scott Michelman, *of counsel*), Center for Social Justice, Seton Hall Law School, *for Amicus Curiae* Scholars of American Constitutional Law, *supporting Plaintiff-Appellant*.

JOSÉ A. CABRANES, *Circuit Judge*:

On September 26, 2002, plaintiff-appellant Maher Arar, a dual citizen of Syria and Canada, and the subject of a U.S. government "lookout," J.A. 88, was detained by U.S. authorities at John F. Kennedy International airport in New York City ("JFK Airport") while en route from Tunisia to Montreal. On October 7, 2002, J. Scott Blackman, then the U.S. Immigration and Naturalization Service ("INS") Regional Director for the Eastern Region, determined, based on a review of classified and unclassified information, that Arar was a member of Al Qaeda and therefore inadmissible to the United States. Pursuant to this determination, Blackman signed an order authorizing Arar to be removed to Syria "without further inquiry before an immigration judge, in accordance with [8 U.S.C. § 1225(c)(2)(B) and 8 C.F.R. § 235.8(b)]." *Id.* at 86.

In February 2004, the Canadian Government convened an official commission ("the Commission") to look into "the actions of Canadian officials in relation to" Arar's detention in the United States, his eventual removal to Syria, and his subsequent detention by Syrian authorities. *See* Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Analysis and Recommendations 11-12 (2006) ("Canadian Commission, Analysis and Recommendations") (describing the scope of the inquiry). The Commission determined that Canadian officials had "requested" that American authorities create lookouts for Arar and his wife, had described Arar to American authorities as an "Islamic Extremist individual[] suspected of being linked to the Al Qaeda

---

[*] Mr Siddiqui and Ms. Balgamwalla appear pursuant to Local Rule 46(e) (appearance by eligible law students).

terrorist movement," and had provided American authorities with information derived from their investigations of Arar. *Id.* at 13. The Commission further determined that "[i]t [wa]s very likely that, in making the decisions to detain and remove Mr. Arar, American authorities relied on information about Mr. Arar provided by the [Royal Canadian Mounted Police]." *Id.* at 14. Accordingly, the Commission recommended that Canadian authorities consider granting Arar's request for compensation from the Canadian government. *Id.* at 369. In January 2007, the Canadian government entered into a settlement agreement with Arar, whereby he received compensation of 11.5 million Canadian dollars (approximately $9.75 million, at the time) in exchange for withdrawing a lawsuit against the Canadian government. *See* Ian Austen, *Canada Will Pay $9.75 Million to Man Sent to Syria and Tortured*, N.Y. Times, Jan. 27, 2007, at A5.[1]

On January 22, 2004, shortly before the initiation of the Canadian inquiry, Arar filed this civil action against Blackman, former U.S. Attorney General John Ashcroft, FBI Director Robert Mueller, former Acting Attorney General Larry D. Thompson, former INS Commissioner James W. Ziglar, INS District Director Edward J. McElroy, the Secretary of Homeland Security, the Regional Director of Immigration and Customs Enforcement for the New York Region, and several unnamed employees of the FBI and INS.[2] Arar alleges that these individuals mistreated him while he was in the United States and then removed him to Syria with the knowledge or intention that he would be detained and tortured there.

Count one of Arar's complaint requests relief under the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA"). Counts two and three request relief under the Fifth Amendment to the

---

[1] We do not adopt or otherwise endorse the findings of the Commission. Our reference to the existence of these findings is consistent with our order of October 23, 2007, in which we granted Arar's motion to take judicial notice of the existence of the report and scope of its contents but declined to take judicial notice of the findings set forth therein.

[2] Arar sues Thompson, Ziglar, Blackman, McElroy and the Doe defendants in their individual capacities. He sues Ashcroft and Mueller in both their individual and official capacities His complaint names the Secretary of Homeland Security and the Regional Director of Immigration and Customs Enforcement in their official capacities only.

U.S. Constitution for Arar's alleged torture (Count two) and detention (Count three) in Syria. Count four requests relief under the Fifth Amendment of the U.S. Constitution for events alleged to have occurred while Arar was detained in the United States. With respect to relief, Arar seeks a declaratory judgment that defendants' conduct violated his "constitutional, civil, and international human rights," as well as compensatory and punitive damages for the statutory and constitutional violations alleged in the complaint. Compl. 24.

In a memorandum and order dated February 16, 2006, the United States District Court for the Eastern District of New York (David G. Trager, *Judge*) dismissed Counts one through three of Arar's suit, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. *See Arar v. Ashcroft*, 414 F. Supp. 2d 250, 287-88 (E.D.N.Y. 2006). The District Court dismissed Count four without prejudice, pursuant to Rule 12(b)(2), for lack of personal jurisdiction over the individual defendants. Upon receiving notice that Arar had elected not to amend his complaint to cure the jurisdictional defects found by the District Court, the Clerk of Court entered judgment dismissing the action with prejudice on August 17, 2006. Arar now brings this appeal.

Arar's suit implicates several questions of first impression for our Court. One threshold question presented on this appeal is whether, as defendants contend, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, deprived the District Court of subject matter jurisdiction over the claims raised in Counts two and three of Arar's complaint. The adjudication of this question is, for the reasons set forth below, *see infra* at **[17-19]**, particularly difficult in light of the record before us. However, because we are compelled to dismiss these claims on the basis of other threshold—that is, non-merits—grounds, we need not determine whether the INA did, in fact, strip the District Court of subject matter jurisdiction to hear Arar's removal-related claims.

We must therefore determine (1) whether the district court had personal jurisdiction over the individual defendants; (2) whether Arar's allegation that U.S. officials conspired with Syrian authorities to torture him states a claim against the U.S. officials under the TVPA; (3) whether to create a judicial

6

damages remedy, pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), for Arar's claims that U.S. officials (a) removed him to Syria with the knowledge or intention that he would be detained and tortured there and (b) mistreated him while he was detained in the United States; and finally, (4) whether Arar may seek a declaratory judgment that defendants' actions violated his constitutional rights.

For the reasons that follow, we conclude that under the precedents of the Supreme Court and our Court: (1) Arar has made a *prima facie* showing sufficient to establish personal jurisdiction over Thompson, Ashcroft, and Mueller at this early stage of the litigation; (2) Count one of Arar's complaint must be dismissed because Arar's allegations regarding his removal to Syria do not state a claim against defendants under the TVPA; (3) Counts two and three of Arar's complaint, which envisage the judicial creation of a cause of action pursuant to the doctrine of *Bivens*, must also be dismissed because (a) the remedial scheme established by Congress is sufficient to cause us to refrain from creating a free standing damages remedy for Arar's removal-related claims; and (b) assuming for the sake of the argument that the existence of a remedial scheme established by Congress was insufficient to convince us, "special factors" of the kind identified by the Supreme Court in its *Bivens* jurisprudence counsel against the judicial creation of a damages remedy for claims arising from Arar's removal to Syria; (4) Count four of Arar's complaint must be dismissed because Arar's allegations about the mistreatment he suffered while in the United States do not state a claim against defendants under the Due Process Clause of the Fifth Amendment; and (5) Arar has not adequately established federal subject matter jurisdiction over his request for a judgment declaring that defendants acted illegally by removing him to Syria so that Syrian authorities could interrogate him under torture.

In the circumstances presented, we need not consider the issues raised by the assertion of the state-secrets privilege by the United States—particularly, whether the exclusion of information pursuant to the privilege might result in the dismissal of certain of Arar's claims.

We do not doubt that if Congress were so inclined, it could exercise its powers under the

7

Constitution to authorize a cause of action for money damages to redress the type of claims asserted by Arar in this action. The fact remains, however, that Congress has not done so. Instead, it has chosen to establish a remedial process that does not include a cause of action for damages against U.S. officials for injuries arising from the exercise of their discretionary authority to remove inadmissible aliens. We are not free to be indifferent to the determinations of Congress, or to ignore the Supreme Court's instructions to exercise great caution when considering whether to devise new and heretofore unknown, causes of action.

Judge Sack concurs in part and dissents in part. Specifically, Judge Sack agrees with the majority that (1) Arar has made a *prima facie* showing sufficient to establish personal jurisdiction over Thompson, Ashcroft, and Mueller; (2) Arar's allegations regarding his removal to Syria do not state a claim against defendants under the TVPA; and (3) Arar has not adequately established federal subject matter jurisdiction over his request for a judgment declaring that defendants acted illegally by removing him to Syria so that Syrian authorities could interrogate him under torture.

Unlike the majority, however, Judge Sack would accept Arar's invitation to judicially create a new *Bivens* remedy and would permit Arar's claims for monetary damages to go forward based on his view that (1) the context giving rise to Counts two and three of Arar's complaint—the detention and deportation of a suspected terrorist pursuant to the discretion conferred on the Attorney General—raises no "'special factors' counsel[ing] against the application of *Bivens*," *see* Dissent at **[46]**; and (2) the constitutional rights that Arar's complaint invokes are sufficiently broad and "clear" that Arar may state a *Bivens* claim based on the conditions of his detention within the United States, *see id.* at **[51]** The analysis by which Judge Sack reaches these conclusions is, in our view, undermined by contradictory assertions and misstatements of the law. We highlight three prominent examples here. First, Judge Sack's opinion does not grapple with the complicated legal questions arising from the extraterritorial application of the U.S. Constitution: it casts the challenged actions "as perpetrated by U.S. agents entirely within the United States," *id.* at **[48 at n.33]**, but then looks to Arar's alleged torture

8

by *Syrian authorities in Syria* as the basis for Arar's Fifth Amendment claim, *id.* at **[29-30]** (observing that "interrogation by torture" undoubtedly "shocks the conscience" and that "whether the defendants violated Arar's Fifth Amendment rights" does not turn on *who Arar claims* committed the torture or *where Arar claims* the torture took place). Second, despite recognizing that Arar's Fifth Amendment claim is based on allegations that Arar was *removed from the United States in order to be tortured in Syria*, Judge Sack nevertheless concludes that Arar's suit involves no "questions of law and fact . . . arising from any action taken or proceeding brought *to remove an alien from the United States*," 8 U.S.C. § 1252(b)(9) (emphasis added)—thereby avoiding the difficult question of whether § 1252(b)(9) stripped the District Court of subject matter jurisdiction to hear Arar's removal-related claims. *See* Dissent **[45 n. 31]**. Third, Judge Sack takes the position that "[t]he assessment of Arar's alleged complaint must take into account the entire arc of factual allegations that Arar makes," *id.* at **[27]**, but criticizes the majority for considering, when evaluating Arar's *Bivens* claim, "the *fact-specific* 'context' of Arar's treatment," *id.* at **[40]**.

Such is the freedom enjoyed by the writer of a dissenting opinion. Those charged with rendering decisions that carry the force of law have no such freedom, however. Our task is to deliver a reasoned opinion that conforms to the precedents of the Supreme Court and our Court; we have done so here. We agree, of course, with Judge Sack's view that threats to the nation's security do not allow us to jettison principles of "simple justice and fair dealing." *Id.* at **[55]** But these parlous times of national challenge can no more expand the powers of the judiciary than they can contract the rights of individuals. The creation of civil damage claims is quintessentially a legislative function, and the protection of national security and conduct of foreign affairs are primarily executive. Whatever the emotive force of the dissent's characterization of the complaint, we cannot disfigure the judicial function to satisfy personal indignation.

## I. Background

### A. Facts alleged

Arar's complaint, which is unverified,[3] sets forth the following relevant factual allegations. On September 26, 2002, U.S. immigration officials detained Arar at JFK Airport while he was transferring flights on his way from Tunisia to Montreal. He remained in U.S. custody for twelve days. For most of this time, he was held at the Metropolitan Detention Center ("MDC") in Brooklyn, NY. Arar claims that on the evening of September 26, he was "placed in solitary confinement" in a room with no bed and with lights that were left on all night. Compl. ¶ 32. On the morning of September 27, he was allegedly questioned by FBI agents who ignored his requests to see a lawyer or make a telephone call. Arar alleges that his requests to see a lawyer or make a telephone call were also ignored between September 27 and October 1.

On October 1, Arar was presented with a document stating that the INS had determined that he was a member of Al Qaeda and was therefore inadmissible to the United States; he was then permitted to make a telephone call to his family, who retained a lawyer on his behalf. The complaint further alleges that Arar met his lawyer at the MDC on the evening of October 5; that, after this meeting, on the evening of Sunday, October 6, defendant McElroy left a message notifying Arar's lawyer that the INS wished to question Arar further; that INS officials then immediately proceeded to question Arar, having falsely told him that his lawyer had chosen not to be present; that, on the following day, INS officials falsely informed Arar's lawyer that Arar had been transferred from the MDC to an unidentified detention facility in New Jersey when, in fact, Arar was still being held at the MDC; and that on October 8, defendant Thompson signed an order authorizing Arar's removal.

The complaint further alleges that, although Arar had designated Canada as the country to which he wished to be removed, on October 8, 2002, U.S. officials caused him to be transported from the MDC to New Jersey, where he was flown to Washington D.C.; and from Washington D.C. to

---

[3] Judge Sack characterizes "[t]he fact that Arar did not choose to verify his complaint . . . [as] irrelevant." Dissent **[2 n.3]** As set forth below, this fact determines whether the complaint itself may serve as evidence in support of the allegations made therein—an issue that, in turn, bears on whether the INA's jurisdiction-stripping provisions deprived the District Court of subject matter jurisdiction over Arar's removal-related claims. *See infra* **[18-20]**

Amman, Jordan, where Jordanian authorities turned him over to Syrian military officials. Syrian authorities allegedly kept Arar in custody for approximately twelve months; initially subjected him to "physical and psychological torture"—including regular beatings and threats of severe physical harm; and confined him throughout this time in an underground cell six feet long, seven feet high, and three feet wide. *Id.* ¶¶ 51-58.

Arar alleges, "[o]n information and belief," that he was removed to Syria pursuant to the U.S. government's "extraordinary rendition" policy, with the knowledge or intention that Syrian officials would extract information from him through torture. *Id.* ¶ 57. He further alleges, "[o]n information and belief," that defendants provided Syrian authorities with information about him, suggested subjects for Syrian authorities to interrogate him about, and received "all information coerced from [him] during [these] interrogations." *Id.* ¶¶ 55-56. Thompson, "as Acting Attorney General," is alleged "[o]n information and belief" to have signed the order authorizing Arar's removal to Syria. *Id.* ¶ 48.

## B.     Procedural history

On January 24, 2005, the United States formally asserted the state-secrets privilege over information relating to Counts one through three of Arar's complaint. Specifically, the United States explained:

> Litigating [Arar's claims] would necessitate disclosure of classified information, including: (1) the basis for the decision to exclude [Arar] from [the United States] based on the finding that [he] was a member of . . . al Qaeda . . .; (2) the basis for the rejection of [Arar's] designation of Canada as the country to which [he] wished to be removed . . .; and (3) the considerations involved in the decision to remove [Arar] to Syria.

J.A. 131-32, 135-36. Shortly thereafter, all defendants moved to dismiss Arar's claims against them. They contended, among other things, that Counts one through three of Arar's complaint should be dismissed because the assertion of the state-secrets privilege by the United States prevented them from

11

introducing evidence required to present a meaningful defense.[4]  Blackman, Ziglar, McElroy, Thompson, Ashcroft, and Mueller further contended that Arar had not alleged sufficient personal involvement to state a claim against them in their individual capacities.  Thompson, Ashcroft, and Mueller contended, moreover, that they were not subject to personal jurisdiction in New York.

In a memorandum and order filed on February 16, 2006, the District Court, without reaching the issues raised by the assertion of the state-secrets privilege by the United States, dismissed Counts one through three of Arar's complaint with prejudice and Count four without prejudice.  With respect to Count one, the District Court concluded that Arar's allegations did not state a claim against defendants under the TVPA.  *See* 414 F. Supp. 2d at 287.  With respect to Counts two and three, it concluded that "special factors" of the kind identified by the Supreme Court counseled against the extension of a *Bivens* remedy, under the Fifth Amendment, for Arar's alleged injuries.  *Id.* at 281-83.  With respect to Count four, involving Arar's allegations about mistreatment while in U.S. custody, the District Court determined that Arar had stated a claim under the Fifth Amendment, *id.* at 286, that defendants were not entitled to qualified immunity, *id.* at 286, but that Arar had not alleged sufficient personal involvement by the defendant officials to sue them in their individual capacities—let alone to establish personal jurisdiction over those defendants domiciled outside New York, *id.*  Arar declined to replead Count four of his complaint.  Accordingly, on August 17, 2006, the Clerk of Court entered a final judgment dismissing Arar's complaint with prejudice.  This timely appeal followed.

On October 23, we directed the parties to submit letter briefs on the question of "whether, and to what extent, the assertion of the state-secrets privilege by the United States could foreclose our ability to adjudicate claims arising from Counts one through three of the complaint."  The United

---

[4] In *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991), we observed that, "[o]nce properly invoked, the effect of the [state-secrets] privilege is to exclude [privileged] evidence from the case."  *Id.* at 546.  Thus, although a plaintiff 's complaint may "state a claim for relief under notice pleading rules," the plaintiff may not be able to obtain "access to evidence necessary . . . to state a prima facie claim."  *Id.* at 547.  Under such circumstances, "dismissal is probably most appropriate under Rule 56 on the ground that plaintiff, who bears the burden of proof, lacks sufficient evidence to carry that burden."  *Id.*

States, in its letter brief, maintained that "[t]his Court can and should affirm the [D]istrict [C]ourt's judgment without reaching the [issues raised by the United States's assertion of the] state-secrets privilege," U.S. Letter Br. 8; but that, "if this Court were to reverse the dismissal of claims 1, 2, or 3, the [D]istrict [C]ourt would then be required to determine on remand whether any reinstated claim could proceed notwithstanding the assertion of the state-secrets privilege," *id.* (internal quotation marks omitted). Arar, in his letter brief, "agree[d] with the United States that this Court can and should resolve the pending appeal without considering the state[-]secrets privilege," Plaintiff's Letter Br. 1, on the understanding that, if he prevailed in our Court, the District Court could conduct the necessary "case-specific inquiries [regarding the state-secrets privilege] . . . on remand," *id.* at 5.

Therefore, with the agreement of the parties, we evaluate the claims presented under applicable law before considering whether the assertion of the state-secrets privilege by the United States requires dismissal of this action.

## II. Discussion

We review de novo a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. *See, e.g.*, *In re NYSE Specialists Securities Litigation*, 503 F.3d 89, 95 (2d Cir. 2007). In doing so, we "accept[] as true the material facts alleged in the complaint and draw[] all reasonable inferences in [the] plaintiff['s] favor." *See Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007) (internal quotation marks omitted), *cert. granted sub nom.*, *Ashcroft v. Iqbal*, 76 U.S.L.W. 3417, 2008 WL 336310 (U.S. June 16, 2008) (No. 07-1015). Defendants also challenged, pursuant to Rule 12(b)(1), the District Court's subject matter jurisdiction over Arar's removal-related claims and, pursuant to Rule 12(b)(2), its personal jurisdiction over Ashcroft, Thompson and Mueller. We begin our analysis with a consideration of these threshold issues.

## A.     Subject matter jurisdiction

A federal court has subject matter jurisdiction over a cause of action only when it "has authority to adjudicate the cause" pressed in the complaint. *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S.

Ct. 1184, 1188 (2007). Determining the existence of subject matter jurisdiction is a threshold inquiry, *see id.*, and a claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it," *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). When jurisdiction is challenged, the plaintiff "bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists," *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (internal quotation marks omitted); *see also Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 639 (2d Cir. 2005), and the district court may examine evidence outside of the pleadings to make this determination, *see Makarova*, 201 F.3d at 113. Accordingly, "'[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Potter*, 343 F.3d at 623 (quoting *Shipping Fin. Servs. Corp v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).[5] When considering a district court's adjudication of such a motion, we review its factual findings for clear error and its legal conclusions de novo. *See id.* at 623-24; *Aurecchione*, 426 F.3d at 638.

Defendants challenge, on statutory grounds, the District Court's subject matter jurisdiction over Counts two and three of Arar's complaint—the *Bivens* claims arising from his overseas detention and alleged torture.[6] Specifically, they contend that Congress (1) explicitly foreclosed judicial review of the Attorney General's discretionary decisions when carrying out removal-related duties and (2) created an alternative forum to litigate other removal-related claims, thereby excepting them from the federal question jurisdiction of the district court. Arar responds that his attempts to avail himself of that alternative forum were thwarted by defendants and that if he is unable to litigate this action in federal district court, he will have no forum whatsoever to press his constitutional claims.

The Supreme Court has observed that construing a statute to "preclude judicial consideration

---

[5] Accordingly, Judge Sack is plainly incorrect to assert that the allegations set forth in Arar's complaint "must be treated as established facts for present purposes." Dissent **[25]**.

[6] Defendants do not challenge the District Court's subject matter jurisdiction over Counts two and three on Article III grounds. We agree that the requirements of Article III have been met with regard to these counts.

. . . of . . . an important question of law . . . would raise serious constitutional questions." *INS v. St. Cyr*, 533 U.S. 289, 314 (2001) (offering this observation in the context of a petition for writ of habeas corpus); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) (noting that a "'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 & n.12 (1986))); *Calcano-Martinez*, 232 F.3d at 340. Accordingly, "where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Webster*, 486 U.S. at 603 (noting, with approval, the Court's earlier observations to this effect in *Weinberger v. Salfi*, 422 U.S. 749 (1975) and *Johnson v. Robison*, 415 U.S. 361 (1974)).

(1)

As an initial matter, defendants question whether any federal court has jurisdiction to review these *Bivens* claims, noting that the INA affords the Attorney General and his delegates discretion to send a removable alien to a country other than the country he has designated, 8 U.S.C. § 1231(b)(2)(C),[7] and insulates from review actions taken pursuant to that discretionary authority, *id.* § 1252(a)(2)(B)(ii).[8] *See, e.g.*, Ashcroft Br. 23-25 (invoking 8 U.S.C. § 1231(b)(2)(C) and § 1252(a)(2)(B)(ii) in support of the proposition that "insofar as Arar complains about not being sent to his preferred designations or about the determination as to membership in a terrorist organization, Congress has foreclosed any judicial review").

Congress has indeed declined to vest the federal courts with jurisdiction to review discretionary

---

[7] Section 1231 provides, in relevant part, that "[t]he Attorney General may disregard" an alien's designation of the country to which he wishes to be removed if, among other things, "the government of the country is not willing to accept the alien into the country," *id.* § 1231(b)(2)(C)(iii) or "the Attorney General decides that removing the alien to the country is prejudicial to the United States," *id.* § 1231(b)(2)(C)(iv).

[8] Section 1252(a)(2)(B)(ii) states, in relevant part, that "no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of [asylum]."

decisions of the Attorney General other than the granting or denial of asylum. *See* 8 U.S.C. § 1252(a)(2)(B)(ii); *Camara v. Dep't of Homeland Sec.,* 497 F.3d 121, 124 (2d Cir. 2007); *Atsilov v. Gonzales*, 468 F.3d 112, 115 (2d Cir. 2006) (noting that the INA "negates our jurisdiction to review a 'decision or action of the Attorney General . . . the authority for which is specified . . . to be in the discretion of the Attorney General'" (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)) (first alteration in original)). Congress has, however, in 8 U.S.C. § 1252(a)(2)(D), authorized the "appropriate court of appeals" to consider "constitutional claims or questions of law raised upon a petition for review filed . . . in accordance with [the judicial review provisions of the INA]." *See, e.g., Xiao Ji Chen v. U.S. Dept. of Justice*, 471 F.3d 315, 329 (2d Cir. 2006). This provision indicates that Congress did not intend to preclude our consideration of removal-related claims that raise questions of law or allege constitutional violations, so long as they are properly before this Court.

**(2)**

As a secondary matter, defendants contend that, even if Arar has raised constitutional claims, such claims were not properly before the District Court; and therefore, are not properly before us on appeal. Specifically, they assert that INA places removal-related claims beyond the reach of a district court's federal question jurisdiction by creating an alternative—and exclusive—mechanism for resolving those claims.[9] Pursuant to 8 U.S.C. § 1252(b)(9), "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States" are channeled into a judicial review scheme providing that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal," 8 U.S.C. § 1252(a)(5). *See also id.* § 1231 note (providing for claims relating to the "involuntary return of

---

[9] *See* Ashcroft Br. 22 ("[Under] the basic judicial review scheme of the INA[,] . . . claims arising out of agency actions do not belong in district court."); Thompson Br. 16-17; Mueller Br. 1 n.1 (joining in co-defendants' arguments); Blackman Br. 27 (same); McElroy Br. 25 (same); Ziglar Br. 21 (same).

16

any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture" to be brought under the judicial review scheme established by section 1252); *Calcano-Martinez v. INS.*, 232 F.3d 328, 340 (2d Cir. 2000) (noting that the judicial review provisions of the INA provide for "exclusive appellate court" jurisdiction over removal-related claims). Defendants urge that Arar's *Bivens* claims related to his alleged detention and torture in Syria "aris[e] from [the] action taken . . . to remove [Arar] from the United States," 8 U.S.C. § 1252(b)(9), and therefore can be reviewed only by petition to the appropriate court of appeals—not by a federal district court.

Federal district courts, like other Article III courts, are "courts of limited jurisdiction . . . [that] possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005) (internal quotation marks omitted). We have previously observed that "statutes . . . that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are 'inextricably intertwined' with review of such orders." *Merritt v. Shuttle, Inc.* 245 F.3d 182, 187 (2d Cir. 2001). In doing so, however, we have noted that "the test for determining whether [a statute vesting exclusive jurisdiction in the courts of appeals] precludes a district court from hearing a particular claim is . . . whether the claim 'could and should have been' presented to and decided by a court of appeals." *Id.* at 188 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958)).

Arar contends that he could not have presented his claims through the procedure set forth in section 1252. He alleges that defendants intentionally prevented him from pursuing the INA's judicial review provisions by denying him access to counsel, concealing his location from his lawyer, and removing him, in secret, before his lawyer could file a petition with our Court. While we are not obliged to assume the truth of these allegations when evaluating whether a claim should be dismissed for lack of subject matter jurisdiction, *see Makarova*, 201 F.3d at 113, we will do so here for the sole purpose of considering whether Arar's allegations, if true, would compel a determination that the

17

District Court had subject matter jurisdiction.

There is authority for the proposition that official obstruction similar to that alleged by Arar may (1) excuse a plaintiff's failure to comply with a filing deadline, *see, e.g.*, *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994) (equitable tolling), or (2) bar a defendant from asserting certain defenses, such as failure to exhaust administrative remedies, *see, e.g., Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004) (equitable estoppel). However, Arar has set forth no authority—and we are aware of none—for the proposition that allegations of *past* interference permit a plaintiff to avoid a congressionally mandated remedial scheme altogether. In other words, it appears that no court has yet considered whether official misconduct of the sort alleged by Arar may vitiate Congress's determination that a federal district court is not the appropriate forum for litigating claims arising from an order of removal.

That we are asked to decide this issue on the basis of allegations set forth in an unverified complaint heightens our hesitation. While a verified complaint made "under oath about a matter within [the plaintiff's] knowledge," *Doral Produce Corp. v. Paul Steinberg Assoc.*, 347 F.3d 36, 39 (2d Cir. 2003), constitutes evidence in support of the facts alleged in the complaint, *see Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), "[a]n ordinary or unverified complaint," such as the one filed by Arar in this litigation, "may not constitute [such] evidence," 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.14 (3d ed. 2007). Permitting a plaintiff to circumvent a congressionally mandated remedial scheme by alleging in an unverified complaint—perhaps on nothing more than information and belief—that government officials blocked access to the relevant forum would permit widespread evasion of the administrative mechanisms that Congress has established for challenging agency action: mechanisms that include judicial review by the court of appeals. It is, after all, the prerogative of Congress to determine the jurisdiction of the district courts, and we are loath to permit those determinations to be

18

so easily thwarted.[10]

## (3)

Because we affirm the District Court's dismissal of Counts two and three of Arar's complaint on the basis that a judicial damages remedy is not authorized by *Bivens* and its progeny, *infra* **[30-37]**, we need not determine whether the INA deprived the District Court of subject matter jurisdiction over Arar's removal-related *Bivens* claims.

The Supreme Court has, on several occasions, recognized that "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping*, 127 S.Ct. 1184, 1191 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)). As the Court has explained: "Jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Id.* at 1191-92 (internal quotation marks and brackets omitted). Accordingly, a federal court "that dismisses on . . . non-merits grounds . . . before finding subject-matter jurisdiction[] makes no assumption of law-declaring power that violates . . . separation of powers principles." *Ruhrgas AG*, 526 U.S. at 584 (internal quotation marks omitted); *see also id.* at 585 (noting that "district courts do not overstep Article III limits when they decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction, *see Moor v. County of Alameda*, 411 U.S. 693, [715-16] (1973), or abstain under *Younger v. Harris*, 401 U.S. 37 (1971), without deciding whether the parties present a case or controversy, *see Ellis v.*

---

[10] The partial dissent concludes that "[b]ecause Arar is not challenging his removal order," the jurisdiction-stripping provisions of the INA "do[] not apply." Dissent **[45 n.31]** We disagree. As the dissent itself acknowledges, although Arar does not directly challenge his order of removal, the circumstances of his removal serve as a factual predicate for the claims set forth in counts two and three of Arar's complaint. *Id.* **[27]** (expressing the view that "[t]he assessment of Arar's alleged complaint must take into account the entire arc of factual allegations that Arar makes—his interception and arrest; his questioning, principally by FBI agents, about his putative ties to terrorists; his detention and mistreatment atJFK Airport in Queens and the MDC in Brooklyn; the deliberate misleading of both his lawyer and the Canadian Consulate; and his transport to Washington, D.C., and forced transfer to Syrian authorities for further detention and questioning under torture"). The INA clearly provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter* shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9) (emphasis added). In light of these clear instructions from Congress, the District Court's jurisdiction to hear this matter cannot be resolved as easily as the dissent might wish. *Cf. Ruhrgas AG*, 526 U.S. at 583 ("For a court to pronounce upon the merits when it has no jurisdiction to do so . . . is for a court to act *ultra vires*.") (ellipsis added, internal quotation marks and modifications omitted).

*Dyson*, 421 U.S. 426, [433-34] (1975)”).

In *Tenet v. Doe*, 544 U.S. 1 (2005), the Court held that it could dismiss a suit pursuant to *Totten v. United States*, 92 U.S. 105 (1876) (precluding suits arising from a secret espionage agreement between the plaintiff and the United States), without first determining whether the district court had subject matter jurisdiction over the claims in question. *See Tenet*, 544 U.S. at 6-7 n.4. The Court reasoned that the issue of whether to entertain the plaintiffs' claim was, like *Younger* abstention or prudential standing, “the sort of ‘threshold question . . . [that] may be resolved before addressing jurisdiction.” *Id.* The Court also observed that “[i]t would be inconsistent with the unique and categorical nature of . . . a rule designed not merely to defeat the asserted claims, but to preclude judicial inquiry—to first allow discovery or other proceedings in order to resolve the jurisdictional question.” *Id.*

Whether Arar's suit was appropriately before the District Court undeniably raises complicated questions of law. In addition, we have concluded that, in light of the Supreme Court's *Bivens* jurisprudence, we are required to dismiss Counts two and three of Arar's complaint as a threshold matter, without considering the merits of the claims raised in those counts. *See infra*, **[30-37]**. Accordingly, we need not decide whether the INA placed Arar's removal-related *Bivens* claims beyond the reach of the District Court's general federal question jurisdiction. *Cf. Sinochem*, 127 S.Ct. at 1194 (“If . . . a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground. . . . But where . . . jurisdiction is difficult to determine, and [other] considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course.”).

**B.      Personal jurisdiction over Ashcroft, Thompson, and Mueller**

The requirement that federal courts have personal jurisdiction over the litigants before them arises from “an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful ‘contacts, ties, or relations.’” *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 318, 319 (1945)). “In order to

20

survive a motion to dismiss for lack of personal jurisdiction [pursuant to Rule 12(b)(2)], a plaintiff must make a *prima facie* showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). A federal court's jurisdiction over non-resident defendants is governed by the law of the state in which the court sits—including that state's long-arm statute—to the extent this law comports with the requirements of due process. *See Henderson v. INS*, 157 F.3d 106, 123 (2d Cir. 1998). Under New York's long-arm statute, "a court may exercise jurisdiction over a non-domiciliary who 'in person or through an agent . . . commits a tortious act within the state' so long as the cause of action arises from that act." *Iqbal*, 490 F.3d at 177 (quoting N.Y. C.P.L.R. § 302(a)(2)).

Defendants Ashcroft, Thompson, and Mueller contend that Arar has failed to make a sufficient showing of their personal involvement in the tortious conduct he alleges. Accordingly, they urge that the claims brought against them be dismissed for lack of personal jurisdiction.

As we recently observed, personal jurisdiction cannot be predicated solely on a defendant's supervisory title; "[r]ather, a plaintiff must show that a defendant personally took part in the activities giving rise to the action at issue." *Iqbal*, 490 F.3d at 177 (internal citation and quotation marks omitted). In *Iqbal*, we considered the related questions of whether the plaintiff had pleaded sufficient personal involvement of the defendants to (1) defeat a qualified immunity defense and (2) establish personal jurisdiction over the defendants. *Id.* We addressed first the question of what a plaintiff must allege to overcome a supervisor's assertion of qualified immunity on a Rule 12(b)(6) motion to dismiss, holding that the allegations must suggest that the supervisory official:

> (1) directly participated in the violation [of his constitutional rights], (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Id.* at 152; *see also id.* at 157-58 (requiring a plaintiff who seeks to establish personal involvement by a defendant official "to amplify [his] claim with some factual allegations in those contexts where such

21

amplification is needed to render the claim plausible").[11]

The complaint at issue in *Iqbal* set forth the "time frame and place" of the acts alleged to have violated the plaintiff's constitutional rights, *id.* at 166; alleged that these violations arose from "policies dealing with the confinement of those arrested on federal charges in the New York City area and designated 'of high interest' in the aftermath of 9/11," *id.* at 175-76; and further alleged that various federal officials, including Ashcroft and Mueller, had "condoned" these policies, *id.* at 165.

We noted that the plaintiff's allegations, "although not entirely conclusory, suggest that some of the [p]laintiff's claims are based not on facts supporting the claim but, rather, on generalized allegations of supervisory involvement." *Id.* at 158. At the same time, we found it

> plausible to believe that senior officials of the Department of Justice would be aware of policies concerning the detention of those arrested by federal officers in the New York City area in the aftermath of 9/11 and would know about, condone, or otherwise have personal involvement in the implementation of those policies.

*Id.* at 166. Taking into account the preliminary stage of that litigation and the Supreme Court's recent clarification of the standard applicable to Rule 12(b)(6) motions to dismiss, *see Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), we concluded that the factual circumstances described in the plaintiff's complaint were sufficiently "plausible" to defeat the defendants' assertion of qualified immunity for lack of personal involvement, *id.* at 166.

Turning to the related question of whether the district court had personal jurisdiction over the defendants, we concluded in *Iqbal* that if a plaintiff has pleaded personal involvement sufficient to defeat a qualified immunity defense, that would also "suffice[] to establish personal jurisdiction." *Iqbal*,

---

[11] The Supreme Court has recently granted certiorari in *Iqbal* for the purpose of considering (1) the appropriate pleading standard when a plaintiff seeks to state an individual-capacity claim, pursuant to *Bivens*, against "a cabinet-level officer or other high-ranking official" and (2) "[w]hether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Petition for a Writ of Certiorari, *Ashcroft v. Iqbal*, 2008 WL 336225 (U.S. Feb. 6, 2008), *cert. granted*, 76 U.S.L.W. 3417, 2008 WL 336310 (U.S. June 16, 2008) (No. 07-1015).

490 F.3d at 177.

The plausibility standard applicable to a Rule 12(b)(6) motion to dismiss is, of course, distinct from the *prima facie* showing required to defeat a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196-98 (2d Cir. 1990). However, because our inquiries into the personal involvement necessary to pierce qualified immunity and establish personal jurisdiction are unavoidably "intertwin[ed]," *Iqbal*, 490 F.3d at 177, we now consider whether, in light of the considerations set forth in *Iqbal*'s qualified immunity analysis, Arar has made a *prima facie* showing that personal jurisdiction exists.

As with the complaint in *Iqbal*, Arar's complaint states the time frame and place of the acts alleged to have violated Arar's rights; alleges that these violations arose from policies providing for the removal of non-U.S. citizens "suspected . . . of terrorist activity" to countries where they could be interrogated under torture, *see* Compl. ¶ 24; and further alleges that defendants "directed, ordered, confirmed, [or] acquiesced" in Arar's removal to Syria and the mistreatment he suffered there, *id.* ¶ 71. We therefore conclude that, like the plaintiff in *Iqbal*, Arar has alleged sufficient facts about the role that Ashcroft, Thompson, and Mueller played in violating his rights to make a *prima facie* showing that personal jurisdiction over those defendants exists under New York's long-arm statute. Accordingly, we proceed to consider the arguments that defendants have raised in support of their motions to dismiss, for failure to state a claim upon which relief can be granted, Arar's various causes of action.

23

**C.**     **The Torture Victim Protection Act (Count One)**

The TVPA, which is appended as a statutory note to the Alien Tort Claims Act, 28 U.S.C. § 1350, creates a cause of action for damages against "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture." *Id.* § 1350 note (a)(1).[12] The District Court determined that the factual allegations set forth in Arar's complaint did not state a claim that defendants acted "under color of foreign law." United States Br. 54. We agree.

When seeking guidance on what it means to act under "color of foreign law" for the purposes of the TVPA, we generally look to "principles of agency law and to jurisprudence under 42 U.S.C. § 1983." *Kadic v. Karadžić*, 70 F.3d 232, 245 (2d Cir. 1995). As the Supreme Court has noted, "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Hayut v. State Univ. of New York*, 352 F.3d 733, 744 (2d Cir. 2003). Applied to the present context, this proposition suggests that a defendant alleged to have violated the TVPA acts under color of foreign law when he "exercise[s] power 'possessed by virtue of [foreign] law'" and commits wrongs "'made possible only because the wrongdoer is clothed with the authority of [foreign] law.'" *West*, 487 U.S. at 49.

Arar contends that our prior holdings contemplate a different standard of liability under § 1983 and, by extension, the TVPA. Specifically, he asserts that "*Kletschka* [*v. Driver*, 411 F.2d 436 (2d Cir. 1969) (Lumbard, *C.J.*)] holds that the § 1983 test is satisfied if the state or its officials played a significant role in the result," Plaintiff's Br. 25 (internal quotation marks omitted). We disagree. In

---

[12] Several Courts of Appeals have held that neither the TVPA nor the Alien Tort Claims Act establishes the United States's consent to be sued under the cause of action created by the TVPA. *See* 28 U.S.C. § 1350; *see also Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) ("[A]ny party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit"); *Koohi v. United States*, 976 F.2d 1328, 1332 n.4 (9th Cir. 1992) (noting that the Alien Tort Claims does not constitute a waiver of sovereign immunity); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) (same). We agree with our sister circuits. Accordingly, we conclude that any cause of action Arar has under the TVPA exists against the defendants being sued in their individual capacities alone.

24

*Kletschka*, we stated that, "[w]hen [a] violation is the joint product of the exercise of a State power and of a non-State power[,] . . . the test under the Fourteenth Amendment and § 1983 is whether the state or its officials played a 'significant' role in the result." 411 F.2d at 449. We also noted, however, that, when the "non-State" actor is a federal official, we will not find that state law played a "significant role" unless the complained-of actions can be attributed to "the control or influence of the State defendants." *Id.* As we explained, this "control or influence" test reflects the "evident purpose of § 1983[,] [which is] to provide a remedy when federal rights have been violated through the use or misuse of a power *derived from a State*." *Id.* at 448-49 (emphasis added). Because federal officials cannot exercise power under foreign law without subjecting themselves to the control or influence of a foreign state, our comments in *Kletschka* are entirely consistent with the test for TVPA liability outlined above, which we hereby adopt in this opinion.

Arar alleges that defendants removed him to Syria with the knowledge or intention that Syrian authorities would interrogate him under torture. He also alleges that, while he was in Syria, defendants provided Syrian authorities with information about him, suggested subjects for Syrian authorities to interrogate him about, and received "all information coerced from [him] during [these] interrogations." Compl. ¶ 56. Nowhere, however, does he contend that defendants possessed any power under Syrian law, that their allegedly culpable actions resulted from the exercise of power under Syrian law, or that they would have been unable to undertake these culpable actions had they not possessed such power. Because prior precedents of the Supreme Court and our Court indicate that such allegations are necessary to state a claim under the TVPA, we affirm the District Court's dismissal of Count one of Arar's complaint.[13]

---

[13] The District Court also determined that Arar, "as a non-citizen[,] is unable to demonstrate that he has a viable cause of action," 414 F. Supp. 2d. at 287, on the understanding that "only U.S. citizens . . . are covered by the TVPA," *id.* at 263. Because we affirm on other grounds, we need not engage in extensive analysis of this issue. We do, however, observe that past holdings of our Court, as well as those of our sister courts of appeals, strongly suggest that TVPA actions may in fact be brought by non-U.S. citizens. *See, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 104-05 (2d Cir. 2000) (expressing the view that the remedies provided by the TVPA "extend[] . . . to aliens"); *Kadic*, 70 F.3d at 236 (reversing a district court judgment that dismissed, for failure to state a claim, a suit brought by "Croat and Muslim citizens of . . . Bosnia-Herzegovina" seeking relief under the TVPA); *see also Arce v. Garcia*, 434 F.3d 1254, 1257-58 (11th

**D.**     **Money damages under the Fifth Amendment (Counts Two, Three, and Four)**

Counts two and three of Arar's complaint allege that defendants violated Arar's rights under the substantive due process component of the Fifth Amendment by removing him to Syria with the knowledge or intention that he would be detained and tortured there. Count four of Arar's complaint alleges that defendants violated Arar's rights to substantive and procedural due process under the Fifth Amendment by mistreating him while he was detained in the United States. Arar contends that both of these alleged violations are actionable pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

On the theory that, "in appropriate circumstances[,] a federal . . . court may provide relief in damages for the violation of constitutional rights if there are 'no special factors counselling hesitation in the absence of affirmative action by Congress,'" *Davis v. Passman,* 442 U.S. 228, 245 (1979) (quoting *Bivens*, 403 U.S. at 396), *Bivens* permitted plaintiffs to seek money damages for violations of the Fourth Amendment. Since then, however, the Supreme Court has created such remedies on only two other occasions: the first for employment discrimination in violation of the equal protection component of the Fifth Amendment's Due Process Clause, *Davis*, 442 U.S. at 234, and the second for violations of the Eighth Amendment by federal prison officials, *Carlson v. Green*, 446 U.S. 14 (1980). *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) ("In 30 years of *Bivens* jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct.").

Indeed, the Supreme Court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Schweiker v. Chilicky,* 487 U.S. 412, 421 (1988); *see also Wilkie v. Robbins,* 127 S. Ct. 2588, 2597 (2007) (observing that, "in most instances," the Court "ha[s] found a *Bivens*

---

Cir. 2006) (allowing TVPA claim by citizens of El Salvador); *Hilao v. Estate of Marcos*, 103 F.3d 767, 771 (9th Cir. 1996) (allowing TVPA claim by citizens of the Philippines).

26

remedy unjustified"); *Malesko*, 534 U.S. at 70 (noting that, since *Carlson*, the Court has "consistently rejected invitations to extend *Bivens*" to new contexts); *FDIC v. Meyer*, 510 U.S. 471, 484 (1994) (discussing, with approval, the observations offered by the Court in *Schweiker*).

By asking us to devise a new *Bivens* damages action for alleged violations of the substantive due process component of the Fifth Amendment, Arar effectively invites us to disregard the clear instructions of the Supreme Court by extending *Bivens* not only to a new context, but to a new context requiring the courts to intrude deeply into the national security policies and foreign relations of the United States.

**(1)**

In its most recent consideration of *Bivens*, the Supreme Court set out the following framework for analyzing *Bivens* claims:

> [O]n the assumption that a constitutionally recognized interest is adversely affected by the actions of federal employees, the decision whether to recognize a *Bivens* remedy may require two steps. [*First*], there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. [*Second,* there is the principle that] a *Bivens* remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation."

*Robbins*, 127 S. Ct. at 2598 (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)) (internal citation omitted, emphasis added).

For guidance on what might constitute a "special factor," we turn to the Supreme Court's past considerations of *Bivens*. The Court's prior precedents reveal a reluctance to create *Bivens* remedies where a coordinate branch of government is "in a far better position than a court," *Bush,* 462 U.S. at 389, to "decide whether . . . a remedy should be provided," *id.* at 380; and, if a remedy is to be provided, to decide what form this remedy should take. For example, in *Bush v. Lucas*, the Court declined to create a damages remedy for alleged violations of a federal employee's First Amendment rights upon determining that Congress was in a better position "to evaluate the impact" of damages suits "on the efficiency of the civil service." *Id.* at 389. Similarly, in *Chappell v. Wallace*, 462 U.S. 296

(1983), the Court declined to create a damages remedy for alleged violations of constitutional rights by military officers upon noting that the Constitution grants Congress "plenary control over . . . regulations, procedures, and remedies related to military discipline," *id.* at 301; Congress, in exercising this authority, created a system of military justice that did not include a damages remedy for alleged violations of constitutional rights by military officers, *id.* at 304; and, therefore, creation of such a remedy by the federal courts "would be plainly inconsistent with Congress' authority in this field," *id.*

In *Schweiker v. Chilicky*, the Court, relying on the reasoning set forth in *Bush* and *Chapell*, declined to create a non-statutory damages remedy against government officials alleged to have wrongfully terminated the plaintiffs' Social Security benefits. As the Court explained, "making the inevitable compromises required in the design" of a welfare program is the responsibility of Congress rather than the courts, 487 U.S. at 429; Congress had "discharged that responsibility," *id.*, by creating "elaborate administrative remedies," *id.* at 424, for dissatisfied Social Security claimants; in view of the fact that these remedies did not include a provision for recovery of money damages, the Court, in keeping with its prior precedents, would not create a *Bivens* remedy, *id.* at 423 (noting that "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, [the Court has] not created additional *Bivens* remedies"). *Schweiker*, therefore, establishes that "the concept of special factors counselling hesitation in the absence of affirmative action by Congress has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent." 487 U.S. at 423 (internal quotation marks omitted).

**(2)**

To the best of our understanding, Arar seeks a *Bivens* remedy for at least two analytically distinct categories of claims. The first set of claims, described in Counts two and three of Arar's complaint, arises from Arar's allegation that defendants removed him to Syria with the knowledge or intention that he would be detained and tortured there. The second set of claims, described in Count four of the complaint, arises from Arar's allegations about the way in which defendants treated him while he was detained in the United States.[14] **[A. 35]** We consider each of these claims in turn.[15]

**(a)**

Arar's removal-related claims arise from the alleged violation of his substantive due process interest in not being involuntarily removed to a country where he would be detained and subjected to torture. Step one of the *Bivens* inquiry reveals that Congress has created alternative processes for protecting this interest. The Foreign Affairs Reform and Restructuring Act of 1988, Pub L. 105-277, codified at 8 U.S.C. § 1231 note ("FARRA"), states that the United States "shall . . . not . . . effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture," *id.* § 1231 note (a); and provides for an alien

---

[14] It is not clear whether Arar's complaint seeks to raise a third potential set of claims, arising from the general allegations that defendants provided Syrian authorities with information about him and suggested subjects for them to pursue in their interrogation of him. *See* Compl. ¶¶ 55-56. We need not explore this issue, however, as Arar has not raised such a claim in his written and oral presentations to this Court. *See, e.g.*, Plaintiff's Br. 37 (describing the Fifth Amendment claims arising from Arar's removal to Syria as resting on the factual allegations that "defendants (i) acted against [Arar] while he was in Federal custody within the United States and; (ii) transported him abroad precisely to evade constitutional protections"); *see also id.* at 3 (describing the Fifth Amendment claims arising from Arar's removal to Syria as resting on the factual allegation that defendants "transport[ed] Arar to Syria" so that Syrian authorities could detain and coercively interrogate him).

[15] Rather than address these legal claims as pleaded by Arar, Judge Sack consolidates all of Arar's allegations into an omnibus generalized grievance, unmoored from any recognized legal claim. Judge Sack would take together events occurring within the United States *and those occurring overseas*; allegations of misconduct attributed to U.S. officials *and to foreign agents*; and violations that allegedly occurred during the period of time that Arar was held in U.S. custody *as well as the time Arar spent in foreign custody*. *See* Dissent **[27-28]** Judge Sack offers no authority to justify his remarkable treatment of Arar's complaint. It is clear, however, that his approach runs contrary to the Supreme Court's long-standing observations about the constitutional significance of geographic borders. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) (noting that the Supreme Court's "rejection of extraterritorial application of the Fifth Amendment [has been] emphatic"); *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950) (noting that "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act").

to raise claims based on this section "as part of the review of a final order of removal pursuant to . . . the Immigration and Nationality Act," *id.* § 1231 note (d). Thus, as a general matter, *Bivens* relief would not be available for removal-related claims such as the one that Arar raises here because the INA's "alternative, existing" mechanism of review would normally provide "a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *Robbins*, 127 S. Ct. at 2598, under step one of our *Bivens* analysis.

Arar maintains, however, that because defendants intentionally prevented him from making use of the INA's judicial review provisions, the allegations of his complaint compel a different conclusion. Assuming that Arar's allegations are true, it would be perverse to allow defendants to escape liability by pointing to the existence of the very procedures that they allegedly obstructed and asserting that his sole remedy lay there. Accordingly, we could regard this as a situation where the presence of an alternative remedial scheme does not "amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *Robbins*, 127 S. Ct. at 2598.

Faced with similar allegations in *Bishop v. Tice*, 622 F.2d 349 (8th Cir. 1980), the Court of Appeals for the Eighth Circuit held that federal officials who interfered with a plaintiff's access to an exclusive administrative remedial scheme could, pursuant to *Bivens*, be held liable for that interference inasmuch as it violated due process, but could not be sued for the underlying injury that the remedial scheme was designed to redress. In *Bishop*, the plaintiff, a federal employee, alleged, *inter alia*, wrongful termination, *id.* at 353, and charged defendants with obstructing his access to the relevant administrative remedies, *id.* at 353 n.4. The Eighth Circuit observed that Congress had enacted "civil service discharge appeal procedures" in order to permit "a wrongfully dismissed employee to [obtain] reinstatement and back pay." *Id.* at 356. The court noted, however, that "[t]he existence of civil service discharge appeal procedures is of little avail to [the plaintiff] . . . if, as he has alleged, defendants blocked his resort to them." *Id.* at 357. On this basis, the court determined that if the plaintiff "can prove [that] defendants interfered with his right to procedural due process [by obstructing access to the

30

appeal process], he is entitled to the damages that actually resulted" pursuant to *Bivens*.

The Eighth Circuit did not conclude, however, that the interference of federal officials permitted the plaintiff to avoid the procedures for appeal set forth by Congress by litigating his underlying claims—wrongful termination and defamation—through a *Bivens* action in federal district court. *Id.* The court explained:

> A *Bivens* style remedy for wrongfully dismissed federal employees not only is unnecessary but also would be at odds with the existing discharge appeal procedures to the extent that dismissed employees would be encouraged to bypass these procedures in order to seek direct judicial relief against either the government or individual government officers.

*Id.* Thus, the plaintiff in *Bishop* could maintain a *Bivens* cause of action against the officials for interfering with his due process rights (a claim equivalent to the claim brought by Arar in Count four of his complaint) but not for employment-related claims subject to the relevant procedures for appealing civil service discharges—in essence, claims of an analogous sort to the claims that Arar brings in Counts two and three of his complaint.

We find this reasoning compelling and, like the Eighth Circuit, are reluctant to permit litigants to avoid congressionally mandated remedial schemes on the basis of mere allegations of official interference. Accordingly, the review procedures set forth by the INA provide "a convincing reason," *Robbins*, 127 S. Ct. at 2598, for us to resist recognizing a *Bivens* cause of action for Arar's claims arising from his alleged detention and torture in Syria.[16] Even if they did not, however, our analysis of the significant "special factors," *id.*, implicated by these claims would lead us to the same result at step two of our *Bivens* analysis.

Step two of our *Bivens* analysis requires us to determine whether Arar's suit implicates what the Supreme Court has described as "special factors" that would counsel against creation of a *Bivens* remedy. "The special factors counselling hesitation in the creation of a new remedy . . . d[o] not

---

[16] We agree with Judge Sack that the alleged circumstances of Arar's removal may have made it difficult for Arar himself to seek relief through the procedures set forth in the INA. We note, however, that Arar did have an attorney working on his behalf; and that his attorney was in a position to inquire about both Arar's whereabouts and the status of the proceedings that the INS had initiated against him.

31

concern the merits of the particular remedy that [i]s sought.  Rather, they relate[] to the question of who should decide whether such a remedy should be provided . . . [and] whether there are reasons for allowing Congress to prescribe the scope of relief that is made available." *Bush*, 462 U.S. at 380. Pursuant to the framework set forth by the Supreme Court, we are compelled to defer to the determination of Congress as to the availability of a damages remedy in circumstances where the adjudication of the claim at issue would necessarily intrude on the implementation of national security policies and interfere with our country's relations with foreign powers.

The Supreme Court has observed on numerous occasions that determinations relating to national security fall within "an area of executive action in which courts have long been hesitant to intrude." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (internal quotation marks omitted); *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988) (noting that, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs" and citing illustrative cases).  At its core, this suit arises from the Executive Branch's alleged determination that (a) Arar was affiliated with Al Qaeda, and therefore a threat to national security, and (b) his removal to Syria was appropriate in light of U.S. diplomatic and national security interests.  There can be no doubt that for Arar's claims to proceed, he must probe deeply into the inner workings of the national security apparatus of at least three foreign countries, as well as that of the United States, in order to determine the basis for his alleged designation as an Al Qaeda affiliate and his removal to Syria via Jordan despite his request to be removed to Canada. Indeed, the Canadian government, which has provided Arar with compensation for its role in the events giving rise to this litigation, has asserted the need for Canada itself to maintain the confidentiality of material that goes to the heart of Arar's claims.  *See* 1 Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Factual Background 11-12 (2006) ("Canadian Commission, Factual Background") (noting that the Canadian government required the Commission to review "[a] good deal of evidence . . . *in camera*" out of a need to protect Canadian "national security

32

and international relations interests"). For its part, the United States, as noted above, has invoked the state-secrets privilege in response to Arar's allegations.

Assuming that a sufficient record can even be developed in light of the confidential nature of the relevant evidence and the involvement of at least three foreign governments—Syria, Jordan, and Canada—in the salient events alleged in the complaint, the District Court would then be called upon to rule on whether Arar's removal was proper in light of the record. In so doing, the effective functioning of U.S. foreign policy would be affected, if not undermined. For, to the extent that the fair and impartial adjudication of Arar's suit requires the federal courts to consider and evaluate the implementation of the foreign and national security policies of the United States and at least three foreign powers, the ability of the federal government to speak with one voice to its overseas counterparts is diminished, and the coherence and vitality of U.S. foreign policy is called into question.

On this point, the observations of the Court of Appeals for the District of Columbia Circuit are particularly relevant:

> [T]he special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. The foreign affairs implications of suits such as this cannot be ignored–their ability to produce what the Supreme Court has called in another context "embarrassment of our government abroad" through "multifarious pronouncements by various departments on one question." Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) (Scalia, *J.*) (quoting *Baker v. Carr*, 369 U.S. 186, 226, 217 (1962)). Similarly, we need not determine whether the motivation behind this lawsuit arises from geopolitical or personal considerations in order to recognize that litigation of this sort threatens to disrupt the implementation of our country's foreign and national security policies. The litigation of Arar's claims would necessarily require an exploration of the intelligence relied upon by the officials charged with implementing our foreign and national security policies, the confidential communications between the United States and foreign powers, and other classified or confidential

33

aspects of those policies, including, perhaps, whether or not such policies even exist.[17]  There can be no doubt that litigation of this sort would interfere with the management of our country's relations with foreign powers and affect our government's ability to ensure national security.

In addition, the Supreme Court has observed that, when considering "the practical consequences of making [a] cause [of action] available to litigants in the federal courts," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732-33 (2004), "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy," *id* at 733 n.21.  Here, the United States has asserted the state-secrets privilege over information at the core of the claims being raised and, in support of that assertion of privilege, both the Acting Attorney General and Secretary of the Department of Homeland Security have submitted sworn statements that Arar's removal-related claims cannot be adjudicated without harming the diplomatic and national security interests of the United States.

For the reasons stated above, we are not required, at this juncture in the proceedings, to consider the possible consequences of the assertion of the state-secrets privilege by the United States. The assertion of the state-secrets privilege is, however, a matter of record, and a reminder of the undisputed fact that the claims under consideration involve significant national security decisions made in consultation with several foreign powers.  *Cf. ante* at **[34-35]** (noting the Canadian government's

---

[17] That adjudication of Arar's claims would require inquiry into national-security intelligence and diplomatic communications cannot be doubted in light of federal regulations providing that, in determining whether removal to a particular country would be consistent with the obligations imposed by FARRA,

    (1)      The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.

    (2)      If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture. . . .

8 C.F.R. § 208.18(c).

efforts to protect evidence relevant to Canadian "national security and international relations interests"); Canadian Commission, Analysis and Recommendations, *ante*, at 11 (stating that the governments of the United States, Jordan, and Syria all declined to "give evidence or otherwise participate" in the hearings held by the Commission). In that sense, the government's assertion of the state-secrets privilege in this litigation constitutes a further special factor counseling us to hesitate before creating a new cause of action or recognizing one in a domain so clearly inhospitable to the fact-finding procedures and methods of adjudication employed by the federal courts.[18]

That this action involves the intersection of removal decisions and national security also weighs against creation of a *Bivens* remedy. The Supreme Court has recently noted that "[r]emoval decisions, including the selection of a removed alien's destination, may implicate our relations with foreign powers," *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005) (internal quotation marks omitted) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)); and it is well established that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—the political—Departments of the Government," *First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 766 (1972) (quoting *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) (internal quotation marks omitted)).[19] In that sense, Arar's removal-related claims raise a difficulty similar to that

---

[18] Our colleague, in his partial dissent, criticizes the majority for taking the state-secrets doctrine into account in the course of its *Bivens* analysis. *See* Dissent **[46]** He would rather this suit go forward on the understanding that "[a]ny legitimate interest that the United States has in shielding national security policy and foreign policy from intrusion by federal courts . . . would be protected by the proper invocation of the state-secrets privilege." *Id.* Once put into effect, however, the state-secrets doctrine would have the undoubted effect of excluding information of central relevance to the claims brought in this complaint. *See ante* **[11-12]** (describing the information over which the United States has asserted the state-secrets privilege). The likely result would be foreclosure of our ability to resolve the important legal issues of first impression raised by this case. *See id.*; *see also El-Masri v. United States*, 479 F.3d 296, 300, 313 (4th Cir. 2007) (dismissing plaintiff's complaint on the basis of the invocation of the state-secrets doctrine by the United States without considering whether, as a matter of law, plaintiff could state a claim under *Bivens* or the Alien Tort Claims Act based on his allegations that he was detained and interrogated "pursuant to an unlawful policy and practice . . . known as 'extraordinary rendition': the clandestine abduction and detention outside the United States of persons suspected of involvement in terrorist activities, and their subsequent interrogation using methods impermissible under U.S. and international laws"). In light of the parties' requests for guidance on the important questions of first impression presented by this suit, *see ante* **[13]** we are reluctant to take the path our colleague suggests.

[19] Judge Sack agrees that adjudication of Arar's claims requires us to intrude deeply into the national security policies and foreign relations of the United States, *see* Dissent **[46-48]**, but, nevertheless, would hold that Arar's suit presents no "'special factors' counsel[ing] against the application of *Bivens*," *id.* at **[46]**.

35

posed by the plaintiffs in *Chappell*. Here, as there, the claim under consideration raises questions entrusted principally to other branches of government; one of these other branches—namely, Congress—has exercised its authority to provide "what it considers adequate remedial mechanisms for constitutional violations," *Schweiker*, 487 U.S. at 423; and the remedial scheme in question—appellate review of removal decisions—does not provide for recovery of money damages. In light of these indications that absence of a Congressionally-mandated damages remedy "has not been inadvertent," *Schweiker*, 487 U.S. at 423, we understand the judicial creation of a damages remedy to be "plainly inconsistent," *Chappell*, 462 U.S. at 304, with Congress's exercise of authority over removal-related claims.

In sum, we hold that—barring further guidance from the Supreme Court—a *Bivens* remedy is unavailable for claims "arising from any action taken or proceeding brought to remove an alien from the United States under" the authority conferred upon the Attorney General and his delegates by the INA. 8 U.S.C. § 1252(b)(9).

**(b)**

The vitality of Arar's request for *Bivens* relief for claims arising from Count four of his complaint ("domestic detention") turns, not on the existence of any "special factors," but on the more commonplace fact that Arar's factual allegations fail to state a claim under the Due Process Clause of the Fifth Amendment. Arar apparently seeks to bring two distinct types of claims based on events alleged to have occurred in the United States. The first is a "due process" claim based on defendants' alleged obstruction of Arar's access to counsel and to the courts.[20] The second is a substantive due process challenge to the conditions of Arar's U.S. detention. We consider each of these in turn.

---

[20] Although Arar describes his second claim as arising under the substantive due process component of the Fifth Amendment, *see, e.g.*, Compl. at 23, Plaintiff's Reply Br. 21, the theory of liability he proffers is more suggestive of a procedural due process claim. *See, e.g.*, Plaintiff's Reply Br. 29 (asserting that "Arar had a right to the assistance of his attorney before being deemed inadmissible, [and] before being removed to a country where he would be tortured"); *id.* at 34 (asserting that Arar had "a right to petition the [relevant court] to enjoin his removal to a country that would torture him"). We need not explore this issue, however, because, as set forth below, Arar has not established that defendants' conduct amounted to interference with a *constitutional* right; and violation of a "constitutionally recognized interest" is a necessary element of a *Bivens* claim, *see, e.g.*, *Robbins*, 127 S. Ct. at 2598.

**(i)**

The complaint alleges that, while Arar was incarcerated at the MDC, defendants ignored his initial requests to see a lawyer, misled him about the availability of his lawyer so that they could question him outside her presence, and misled his lawyer about his whereabouts so that they could prevent her from challenging his removal to Syria. Compl. ¶¶ 37, 44, 46. These allegations, if taken as true, may be sufficient to establish that one or more federal officials intentionally obstructed Arar's access to counsel and to the courts. They are not, however, sufficient to establish the appropriateness of *Bivens* relief. Rather, for a *Bivens* remedy to be available, Arar must establish that (1) an individual in his position possessed a constitutional right of access to counsel and the courts, and (2) that defendants' actions violated this constitutional right. *See, e.g.*, *Robbins*, 127 S. Ct. at 2598 (noting that violation of a "constitutionally recognized interest" is a necessary element of a *Bivens* claim).

### a. Right to Counsel

Arar contends that our prior precedents—specifically, *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991) and *Waldron v. INS*, 17 F.3d 511 (2d Cir. 1993)—establish that, although he was an unadmitted alien, he possessed a constitutional right to counsel under the Due Process Clause of the Fifth Amendment. He also contends that he possessed a due process right to counsel derived from the

rights accorded to him under 8 C.F.R. § 235.8(a)[21] and 8 U.S.C. §§ 1362,[22] 1225(c)(3),[23] and

1225(b)(1)(B)(iv).[24] We conclude that certain of the authorities upon which Arar relies—namely,

*Montilla*, *Waldron*, and 8 U.S.C. §§ 1362 and 1225(b)(1)(B)(iv)—are simply inapplicable to an individual

in Arar's position. We further conclude that, even if an unadmitted alien does enjoy a derivative due

process right to the assistance of counsel under 8 U.S.C. § 1225(c)(3) and 8 C.F.R. § 235.8(a), that right

was neither triggered nor violated by the factual allegations stated in Arar's complaint.

Section 1362 applies only to "removal proceedings before an immigration judge and . . . appeal

proceedings before the Attorney General." Similarly, *Montilla* and *Waldron*, recognize the existence of a

due process right to counsel in a subset of the circumstances to which section 1362 applies—that is,

removal of an alien through deportation. *See Waldron*, 17 F.3d at 517; *Montilla*, 926 F.2d at 166

As an unadmitted alien, Arar as a matter of law lacked a physical presence in the United

---

[21] 8 C.F.R. § 235.8(a) reads as follows:

When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible [on security and related grounds], the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form I-147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

[22] 8 U.S.C. § 1362 states that:

In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

[23] 8 U.S.C. § 1225(c) sets out procedures for the removal of aliens who have been deemed inadmissible "on security and related grounds." Subsection 1225(c)(3) provides that, in the case of an alien who falls within the ambit of section 1225(c), "[t]he alien or the alien's representative may submit a written statement and additional information for consideration by the Attorney General."

[24] 8 U.S.C. § 1225(b)(1)(B) sets forth procedures relating to asylum interviews. Subsection 1225(b)(1)(B)(iv) provides that "[a]n alien who is eligible for [an asylum] interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process."

States.[25]  *See Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (noting that an alien "stopped at the boundary line" of the United States "had gained no foothold" in the country).  His entitlement to a removal procedure of the sort that would trigger the provisions of section 1362 was therefore limited to what Congress and the INS saw fit to provide.[26]  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (observing that the

[25] Judge Sack emphatically proclaims that this is not "an immigration case," *see* Dissent **[22]**, and contends that the majority is incorrect to "treat[] Arar[] . . . as though he were an unadmitted alien," *id.* at **[31]**.  Specifically, Judge Sack takes the position that, in regarding Arar as an unadmitted alien, the majority incorrectly "treats Arar as though he was an immigrant seeking entry into the United States."  *Id.* at **[32 n.21]**; *see also id.* at 32 (taking the position that Arar cannot properly be treated "for immigration purposes, as though he had been held or turned back at the border" because Arar was not "seeking to immigrate to the United States") (emphasis omitted).

This represents a mischaracterization of the majority's approach, as well as the relevant law and regulations.  Arar's intention, or lack thereof, to immigrate to the United States is irrelevant to the question of whether he was an admitted or unadmitted alien.  The INA defines "[t]he terms 'admission' and 'admitted' [to] mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A); *see also id.* § 1101(a)(4) ("*The term 'application for admission' has reference to the application for admission into the United States* and not to the application for the issuance of an immigrant or nonimmigrant visa.") (emphasis added).  At the time that the events described in this complaint took place, individuals who, like Arar, were eligible to transfer flights through the United States without obtaining a visa first, *see* 8 C.F.R. § 1212.1(f)(1) (describing the "transit without visa" program) were nevertheless subject to "the full border inspection process upon arrival in the U.S," *see* Press Release, Department of Homeland Security, Homeland Security and Department of State Take Immediate Steps To Make Air Travel Even Safer (Aug. 2, 2003), available at http://www.dhs.gov/xnews/releases/press_release_0227.shtm (last visited June 11, 2008).

Accordingly, it is clear that (1) in subjecting himself to inspection upon arrival at JFK, Arar sought admission to the United States for purposes of the INA; and (2) because the immigration officer refused to authorize Arar's entry into the United States, Arar was not "admitted" for purposes of the INA.  In sum, there is no basis—legal or factual—for the criticisms offered by our colleague in his partial dissent.

[26] Our colleague, in his partial dissent, also asserts that Arar's legal status as an unadmitted alien is irrelevant to any analysis of Arar's constitutional claims.  This is plainly incorrect.  The Supreme Court—both recently and in the past—has looked to the legal status of aliens under immigration law when considering petitions challenging the confinement of these aliens under the Due Process Clause of the Fifth Amendment.  *See, e.g.*, *Zadvydas*, 533 U.S. at 690 (identifying the issue under consideration to be whether the "indefinite detention of an alien" violates "[t]he Fifth Amendment's Due Process Clause" and beginning the analysis of the claim brought by noting that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law").  In *Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953), for example, the Court considered the petition of an alien challenging the Attorney General's ability to detain him "without notice of any charge against him and without opportunity to be heard in opposition thereto."  *Id.* at 595.  The Court observed that, "[f]or purposes of [ascertaining] [the petitioner's] constitutional right to due process," it was required to take into account that the petitioner's legal status was that "of an alien continuously residing and physically present in the United States."  *Id.* at 596.  As the Court explained:

> The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.  But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders.  Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment."

*Id.* at 596 n.5.  With respect to the relevance of an alien's legal status, Judge Sack distinguishes between claimed violations of "procedural" due process, where he concedes that status is relevant, and "substantive" due process, where he maintains that status is not.  In view of the fact that Judge Sack does not offer any supporting authority from the Supreme Court or our Court—nor are we aware of any—we decline to disregard binding precedent that takes account of an alien's status when considering the scope of that alien's due process rights.

full protections of the Due Process Clause apply only to "'persons' within the United States"); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (noting that "an alien seeking initial admission to the United States . . . has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative"); *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) (holding that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

In this case, the applicable statutory provisions specifically authorized the Attorney General to remove Arar "without further inquiry or hearing by an immigration judge" if the Attorney General, after reviewing the evidence establishing his inadmissibility, determined that a hearing "would be prejudicial to the public interest, safety, or security.[27] *See* 8 U.S.C. § 1225(c)(2)(B). Arar does not claim that the Attorney General failed to properly review the evidence of his inadmissibility. Nor does he contend that the procedures set forth in section 1225(c) were constitutionally inadequate. *Cf. Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) (holding that the due process rights of an unadmitted alien barred from entry on security grounds were not violated when he was excluded from the United States without a hearing). Accordingly, Arar fails to establish that he possessed any entitlement to a pre-removal hearing. And because he possessed no entitlement to a hearing, he falls beyond the scope of section 1362 and—by extension—our holdings in *Montilla* and *Waldron*. *Cf. Plasencia*, 459 U.S. at 25 (noting that a "deportation hearing is the usual means of proceeding against an alien already physically in the United States, . . . [and] [an] exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission," and that "the alien who loses his right to reside in the United States in a deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding"). Arar also falls beyond the

---

[27] Arar was removed pursuant to 8 U.S.C. § 1182(a)(3) (removability on security and related grounds) under the procedures set forth in 8 U.S.C. § 1225(c); subsection 1225(c)(2)(B) provides that:

> If the Attorney General (i) is satisfied on the basis of confidential information that the alien is inadmissible . . . and (ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security, the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

scope of the right to counsel set forth in section 1225(b)(1)(B)(iv); this provision is limited to applicants for asylum and Arar neither made and nor makes no claim to asylum in the United States.

Section 1225(c)(3) and 8 C.F.R. § 235.8(a) both contemplate that an unadmitted alien being excluded on security grounds will have the opportunity to submit "a written statement and additional information for consideration by the Attorney General." Assuming for the sake of argument that an unadmitted alien who cannot provide a written statement without the assistance of counsel may enjoy a due process entitlement to counsel, we conclude that Arar has not alleged any facts that would trigger such a right. For example, Arar's complaint nowhere alleges that he wished to submit a written statement but was prevented from doing so by the restrictions that defendants allegedly imposed on his access to counsel. Nor does it allege any background circumstances from which we may draw such an inference.[28]

In sum, Arar is unable to point to any legal authority suggesting that, as an unadmitted alien who was excluded pursuant to the procedures set forth in 8 U.S.C. § 1225(c), he possessed any form of entitlement to the assistance of counsel—let alone a constitutional entitlement, the violation of which could constitute a predicate for the *Bivens* relief he seeks. Accordingly, we conclude that Arar's allegations about the various ways in which defendants obstructed his access to counsel fail to state a claim under the Due Process Clause of the Fifth Amendment.

### b. Right of Access to the Courts

As the Supreme Court has noted, the ultimate purpose of an access to the courts claim is to obtain "effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002). For this reason, the complaint setting forth the claim in question must include an adequate description of a "'nonfrivolous,' 'arguable' underlying claim" that the plaintiff has lost as a result of the complained-of official actions. *Id.* at 415.

---

[28] We note that Arar's allegation that he "was never given a meaningful opportunity to contest [the] finding" that he belonged to Al Qaeda, Compl. ¶ 38, constitutes a " legal conclusion[] couched as [a] factual allegation[]," *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121(2d Cir. 2007).

41

Arar's complaint fails this test insofar as his complaint fails to set forth adequately "the underlying cause of action," *id.* at 418, that defendants' conduct compromised. *Compare id.* at 418 (finding excessively vague the plaintiff's claim that the defendants' "false and deceptive information and concealment foreclosed [the plaintiff] from effectively seeking adequate legal redress") *with* Compl. ¶ 93 (alleging that, by subjecting Arar to "measures . . . that interfered with his access to lawyers and the courts, Defendants . . . violated Plaintiff's right . . . to petition the courts for redress of his grievances"). Although Arar now claims that defendants compromised his right to seek a court order "enjoin[ing] his removal to a country that would torture him, as a violation of FARRA and [the Convention Against Torture ("CAT")]," Plaintiff's Reply Br. 34, his complaint makes no mention of FARRA, the CAT, or the possibility of injunctive relief. *Cf. Harbury*, 536 U.S. at 416 ("Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant."). Indeed, Arar's complaint alleges that "[d]efendants . . .violated [p]laintiff's right . . . to petition the courts for redress of his grievances" without any further elaboration whatsoever. Compl. ¶ 93. This conclusory allegation falls far short of the pleading standard set forth in *Harbury*. *See Harbury*, 536 U.S. at 418 ("[T]he complaint failed to identify the underlying cause of action that the alleged deception had compromised, going no further than the protean allegation that the State Department and NSC defendants' 'false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.'"). Accordingly, we conclude that Arar has failed to state a due process claim based on defendants' alleged obstruction of his access to the courts.

**(ii)**

The framework for evaluating a conditions-of-confinement challenge brought by an unadmitted alien constitutes a question of first impression for our Court. *Cf. Lynch v. Cannatella,* 810 F.2d 1363, 1373 (5th Cir. 1987) (noting that "[t]he 'entry fiction' that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States . . . . does not limit the right

42

of excludable aliens detained within United States territory to humane treatment"). Defendants urge us to adopt the position taken by the Fifth Circuit and Eleventh Circuit, both of which look to whether the challenged actions amounted to "gross physical abuse." *Lynch,* 810 F.2d at 1374; *see also Correa v. Thornburgh*, 901 F.2d 1166, 1171 n.5 (2d Cir. 1990) (noting, in passing, the holding of *Lynch*); *Adras v. Nelson,* 917 F.2d 1552, 1559 (11th Cir. 1990) (adopting and applying the approach set forth by the Fifth Circuit in *Lynch*). Arar, in turn, urges us to apply the approach that we have traditionally taken when evaluating substantive due process challenges to conditions of pre-trial confinement. This approach looks to whether the challenged conditions amount to "punishment that may not constitutionally be inflicted upon [pre-trial] detainees *qua* detainees." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984) (applying this approach); *Iqbal*, 490 F.3d at 168-69 (same).

Arar alleges that, while in the United States, he was subjected to "coercive and involuntary custodial interrogations . . . . conducted for excessively long periods of time and at odd hours of the day and night" on three occasions over twelve days; deprived of sleep and food on his first day of detention; and, thereafter, was "held in solitary confinement, chained and shackled, [and] subjected to [an] invasive strip-search[]." Compl. ¶ 4. These allegations, while describing what might perhaps constitute relatively harsh conditions of detention, do not amount to a claim of gross physical abuse. *Cf. Adras,* 917 F.2d at 1559 (finding that detainees had not sufficiently alleged "gross physical abuse" where their complaint claimed, *inter alia*, "insufficient nourishment," "prolonged incarceration under harsh conditions," "deprivation of liberty, embarrassment, humiliation, disgrace and injury to feelings, physical and mental pain and suffering"). For this reason, we conclude that Arar has not adequately alleged that the conditions of his confinement violated his Fifth Amendment substantive due process rights under the "gross physical abuse" approach of the Fifth Circuit and Eleventh Circuit.

Arar fares no better under the alternative standard he proposes.[29] As the Supreme Court noted

---

[29] Judge Sack disagrees with our decision to evaluate Arar's substantive due process claims under the standard that Arar proposes, characterizing the Supreme Court's analysis in *Wolfish* as "unhelpful" because Arar "was not a pre-trial detainee." Dissent **[35 n.24]** Accordingly, we are puzzled to note that Judge Sack elects to base his conclusion that a *Bivens* action should be available to Arar on two *courts of appeals* decisions relating to the rights of pretrial detainees:

in *Wolfish*, "the fact that [lawful] detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" 441 U.S. at 537. Only if a detention facility official has "expressed intent to punish," *id.* at 538 or "a restriction or condition is not reasonably related to a legitimate goal" may a court "infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees," *id.* at 539. Arar nowhere alleges that the conditions of his confinement were inflicted with punitive intent or were otherwise unrelated to a legitimate government purpose. Rather, his complaint repeatedly emphasizes that defendants kept him in custody in order to interrogate him, and sought to interrogate him in an effort to obtain information "about his membership in or affiliation with various terrorist groups." Compl. ¶ 31. Nor do the other incidental conditions of his detention—specifically, the shackling, strip search, and delay in providing him with adequate food and sleeping facilities—rise to the level of a constitutional violation. *Cf. Wolfish*, 441 U.S. at 530, 543, 558 (rejecting the claim that, in subjecting pre-trial detainees to visual body cavity searches and using common rooms to provide temporary sleeping accommodations, the officials running a federal detention facility had violated the detainees' rights of substantive due process). For this reason, we conclude that Arar's allegations also fail to state a claim under the punishment-focused approach we have traditionally applied when analyzing substantive due process challenges to conditions of pre-trial confinement.

Because it is not implicated by the facts of this case, we leave for another day the question of whether an unadmitted alien challenging his conditions of confinement has rights beyond the right to be free of "gross physical abuse at the hands of state [and] federal officials," *Lynch,* 810 F.2d at 1374.

**(iii)**

Having determined that the allegations set forth in Count four of Arar's complaint do not

---

*Iqbal v. Hasty,* 490 F.3d 143 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal,* 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015) and *Magluta v. Samples,* 375 F.3d 1269 (11th Cir. 2004). *See* Dissent **[40, 42]**.

44

state a claim under the Due Process Clause of the Fifth Amendment, we affirm the order dismissing Count four of Arar's complaint. Contrary to Judge Sack's suggestion, we do not hold that a *Bivens* action is unavailable for the claims raised in Count four of Arar's complaint. *See* Dissent **[21]** Rather, we decline to reach this question in light of Arar's failure to allege facts that, if taken as true, establish the violation of any "constitutionally protected interest." *Robbins*, 127 S. Ct. at 2598.

## E.    Declaratory relief (General Prayer for Relief)

Arar's prayer for relief includes a request that this Court enter a judgment declaring that the actions defendants took with respect to him "are illegal and violate [his] constitutional, civil, and international human rights." Compl. at 24. Following the Supreme Court's instructions, we begin our analysis by considering "whether this action for a declaratory judgment is the sort of Article III case or controversy to which federal courts are limited." *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998) (internal quotation marks omitted).

As the Supreme Court has frequently noted, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); and "the irreducible constitutional minimum of standing contains three elements," *id.*:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, [affecting the plaintiff in a personal and individual way] and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (citations and internal quotation marks omitted, first alteration supplied); *see also Baur v. Veneman*, 352 F.3d 625, 631-32 (2d Cir. 2003). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

The conduct of which Arar complains is his alleged detention, by defendants, "for the purpose of removing him to Syria for arbitrary detention and interrogation under torture." Plaintiff's Br. 55.

The personal injury he alleges is a "bar to reentering the United States," which harms him "because he has worked for sustained periods for U.S. companies in the past, and . . . would like to return to the U.S. for that purpose, as well as to visit relatives and friends." Plaintiff's Br. 54.

In examining Arar's claim, we conclude that he fails to meet both the "traceability" and "redressability" prongs of the test for constitutional standing set forth by the Supreme Court. The re-entry bar from which Arar seeks relief arises as an automatic incident of (1) the finding that Arar was inadmissible to the United States for reasons of national security, *see* 8 U.S.C. § 1182(a)(3)(B); and (2) the entry of an order of removal pursuant to that finding, *see* 8 U.S.C. § 1225(c). It bears no relationship with the country of removal that defendants selected for Arar. Any injury associated with the re-entry bar is, therefore, not "fairly traceable" to the conduct of which Arar complains—namely, defendants' removal of Arar "*to Syria* for arbitrary detention and interrogation under torture." Plaintiff's Br. 55 (emphasis added).

The problem with redressability arises because, as Arar's submissions to both this Court and the District Court unequivocally establish, Arar does not directly challenge his removal order or defendants' underlying decision to classify him as inadmissible to the United States. *See* 414 F.Supp. 2d *at* 259 (discussing Arar's brief in opposition to defendants' motion to dismiss). Arar contends that "if [he] prevails on his constitutional claims, the removal order will be expunged as null and void, thereby lifting the current barrier to [his] re-entry into the U.S." Plaintiff's Br. 53. He does not, however, articulate the theory on which he bases this argument or, for that matter, set forth any authority in support of his position. We conclude that Arar's claimed injury—namely, the bar to his re-entry to the United States pursuant to a removal order, the lawfulness of which he does not challenge—is not likely to be redressed (indeed, cannot be redressed) by the declaratory judgment he seeks. That is so because a declaration that defendants acted illegally by removing Arar to a particular country for a particular purpose would not change the underlying, uncontested fact that Arar cannot be admitted to the United States: Even if Arar had been removed to Canada rather than Syria, he would still be inadmissible to the

46

United States by virtue of the order of removal entered against him.

Because Arar cannot meet the test for constitutional standing set forth by the Supreme Court, we lack subject matter jurisdiction over his request for a judgment declaring that defendants violated his rights by removing him to Syria for the purpose of arbitrary detention and interrogation under torture.

**CONCLUSION**

To summarize:

(1) Because we conclude that reasons independent of the state-secrets privilege require dismissal of Arar's complaint, we do not consider whether, if Arar were able to state a claim for relief under notice pleading rules, the assertion of the state-secrets privilege by the United States would require dismissal of Counts one through three of his complaint.

(2) Because we conclude that Arar's complaint has not stated a claim upon which relief can be granted, we need not consider defendants' argument that if any of Arar's claims were cognizable defendants would be entitled to qualified immunity with respect to those claims.

(3) Arar has satisfied Article III requirements as to the claims raised in Counts two and three of his complaint. However, the adjudication of whether, under the facts of this case, the INA stripped the District Court of subject matter jurisdiction to hear Arar's removal-related constitutional claims would be particularly difficult in light of the record before us. Accordingly, we exercise our discretion to dismiss Counts two and three on other threshold—that is, non-merits—grounds, as set forth below.

(4) For the reasons stated above, we conclude that Arar has made a *prima facie* showing sufficient to establish personal jurisdiction over Thompson, Ashcroft, and Mueller at this early stage of the litigation.

As to the causes of action set forth in Arar's complaint, we conclude that:

(5) Count one of Arar's complaint must be dismissed because Arar's allegations about the events surrounding his removal to Syria do not state a claim against defendants under the Torture Victim Protection Act;

47

(6) Counts two and three of Arar's complaint, which envisage the judicial creation of a cause of action pursuant to the doctrine of *Bivens*, must also be dismissed because (a) the remedial scheme established by Congress is sufficient to convince us at step one of our *Bivens* analysis to refrain from creating a free standing damages remedy for Arar's removal-related claims. Even giving Arar the benefit of the doubt and assuming that this remedial scheme were insufficient to convince us, (b) "special factors" of the kind identified by the Supreme Court in its *Bivens* jurisprudence counsel against the judicial creation of a damages remedy for claims arising from Arar's removal to Syria;

(7) Count four of Arar's complaint must be dismissed because Arar's allegations about the mistreatment he suffered while in the United States do not state a claim against defendants under the Due Process Clause of the Fifth Amendment; and

(8) With respect to Arar's petition for a declaratory judgment, Arar has not adequately established federal subject matter jurisdiction over his request for a judgment declaring that defendants acted illegally by removing him to Syria so that Syrian authorities could interrogate him under torture.

The judgment of the District Court is **AFFIRMED**.

Arar v. Ashcroft, No. 06-4216

Sack, Circuit Judge, concurring in part and dissenting in part

----------------------------------------------------------------

## I. OVERVIEW

Last year, in Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) (Newman, J.), cert. granted sub nom. Ashcroft v. Iqbal, 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015), "[w]e . . . recognize[d] the gravity of the situation that confronted investigative officials of the United States as a consequence of the 9/11 attacks.  We also recognize[d] that some forms of governmental action are permitted in emergency situations that would exceed constitutional limits in normal times."  Id. at 159 (citation omitted).  But, we pointed out,

> most . . . rights . . . do not vary with surrounding circumstances, such as the right not to be subjected to needlessly harsh conditions of confinement, the right to be free from the use of excessive force, and the right not to be subjected to ethnic or religious discrimination.  The strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times.

Id.[1]

The majority fails, in my view, fully to adhere to these principles. It avoids them by mischaracterizing this as an immigration case, when it is in fact about forbidden tactics allegedly employed by United States law enforcement officers in a terrorism inquiry. Although I concur in some parts of the judgment, I respectfully dissent from its ultimate conclusion. I would vacate the judgment of the district court granting the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and remand for further proceedings

* * *

The plaintiff-appellant, Maher Arar, a resident of Ottawa, Canada, and a dual citizen of Canada and Syria,[2] alleges[3] that on September 26, 2002, he was, by travel happenstance, a transit passenger at New York's John F. Kennedy International Airport ("JFK Airport") in Queens, New York. He had cut short a family vacation in Tunisia and was bound, he thought, for a business meeting in Montreal. What happened to him next would

---

[1] The Supreme Court granted certiorari in Iqbal to address (1) the requirements under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), for stating an "individual-capacity claim[]" against a "cabinet-level officer or other high-ranking official," and (2) the extent to which a "cabinet-level officer or other high-ranking official" can be held "personally liable for the allegedly unconstitutional acts of subordinate officials." Ashcroft v. Iqbal, 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015); see also Petition for a Writ of Certiorari, Ashcroft v. Iqbal, No. 07-1015 (U.S. cert. granted sub nom. June 16, 2008). These questions have no bearing on the propositions for which this dissent cites Iqbal.

[2] As a teenager, Arar had emigrated from Syria to Canada where he lived with his parents, and then his wife and children.

[3] For present purposes, on this appeal from a dismissal of the complaint under Fed. R. Civ. P. 12(b)(6), the facts are the factual allegations as pleaded in the complaint. See, e.g., Iqbal, 490 F.3d at 147. The fact that Arar did not choose to verify his complaint, see ante at [10, 19], is irrelevant. 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1339 (3d ed. 2004) ("Under Federal Rule 11, pleadings, motions, and other papers need not be verified or accompanied by an affidavit except when 'specifically provided by rule or statute' . . . [and] [a] party's verification of a pleading that need not have been verified does not give the pleading any added weight or importance in the eyes of the district court.").

50

beggar the imagination of Franz Kafka.

When Arar sought to pass through the immigration check-point at JFK Airport in order to catch his connecting flight to Montreal, he was detained by U.S. agents who had been led to believe, on the basis of information provided by Canadian government officials, that Arar had connections with al Qaeda. FBI agents first, and then Immigration and Naturalization Service ("INS")[4] officers, held Arar largely incommunicado at several locations in New York City for thirteen days, subjecting him to harsh interrogation under abusive conditions of detention.

Unable to acquire from him the information they sought, the agents attempted to obtain Arar's consent to be removed to Syria. They expected Syrian officials to continue questioning him, but under conditions of torture and abuse that they, the U.S. government agents, would not themselves employ. When Arar declined to consent, the agents sent him to Syria against his will for the purpose, ultimately fulfilled, of having him held captive and further questioned under torture there.

Arar brought suit in the United States District Court for the Eastern District of New York on both statutory and constitutional grounds. He seeks damages from the federal officials he thinks responsible for his abuse. The district court dismissed the action for failure to state a claim upon which relief can be granted. This Court now affirms. I disagree in significant part, and therefore respectfully dissent in significant part.

---

[4] On March 1, 2003, the INS was reconstituted as the Bureau of Immigration and Customs Enforcement and the Bureau of United States Citizenship and Immigration Services, both within the Department of Homeland Security. The actions at issue in this appeal were taken when the agency was still known as the INS.

## II. THE FACTS AS ALLEGED IN ARAR'S COMPLAINT

The majority provides a strikingly spare description of the allegations of fact on the basis of which Arar mounts this appeal. The district court's opinion, see Arar v. Ashcroft, 414 F. Supp. 2d 250, 252-57 (E.D.N.Y. 2006), by contrast, rehearses the facts in considerable detail. According to the district court, the complaint alleges the following facts, repeated here nearly verbatim.[5] They "are assumed to be true for purposes of the pending appeal[], as . . . [is] required [when] . . . reviewing a ruling on a motion to dismiss." Iqbal, 490 F.3d at 147.

A. Arar's Apprehension, Detention, and Forcible Transportation to Syria

Arar, in his thirties, is a native of Syria. He immigrated to Canada with his family when he was a teenager. He is a dual citizen of Syria and Canada. He resides in Ottawa.

In September 2002, while vacationing with his family in Tunisia, he was called back to work by his employer[6] to consult with a prospective client. He purchased a return ticket to Montreal with stops[7] in Zurich and New York. He left Tunisia on September 25, 2002. (Arar, 414 F. Supp. 2d at 252.)

On September 26, 2002, Arar arrived from Switzerland at JFK Airport in New York to catch a connecting flight to Montreal.

---

[5] Citations to the district court opinion are in parentheses. The footnotes and subheadings are mine.

[6] Arar was employed by The MathWorks, Inc., a privately held, Massachusetts-based developer and supplier of software for technical computing. See Complaint, ¶ 12; About The MathWorks, http://www.mathworks.com/company/aboutus/ (last visited May 31, 2008).

[7] That is, changes of plane.

Upon presenting his passport to an immigration inspector, he was identified as "the subject of a . . . lookout as being a member of a known terrorist organization." Complaint ("Cplt.") Ex. D (Decision of J. Scott Blackman, Regional Director) at 2. He was interrogated by various officials for approximately eight hours.[8] The officials asked Arar if he had contacts with terrorist groups, which he categorically denied. Arar was then transported to another site at JFK Airport, where he was placed in solitary confinement. He alleges that he was transported in chains and shackles and was left in a room with no bed and with lights on throughout the night. (Arar, 414 F. Supp. 2d at 253.)

The following morning, September 27, 2002, starting at approximately 9:00 a.m., two FBI agents interrogated Arar for about five hours, asking him questions about Osama bin Laden, Iraq, and Palestine. Arar alleges that the agents yelled and swore at him throughout the interrogation. They ignored his repeated requests to make a telephone call and see a lawyer. At 2:00 p.m. that day, Arar was taken back to his cell, chained and shackled, and provided a cold McDonald's meal -- his first food in nearly two days. (Id.)

That evening, Arar was given an opportunity to voluntarily return to Syria, but refused, citing a fear of being tortured if returned there and insisting that he be sent to Canada or returned to Switzerland. An immigration officer told Arar that the United States had a "special interest" in his case and then asked him to sign a form, the contents of which he was not allowed

_____

[8] According to the complaint, on that day, Arar was questioned first by an FBI agent for five hours, Cplt. ¶ 29, then by an immigration officer for three hours, Cplt. ¶ 31.

53

to read. That evening, Arar was transferred, in chains and shackles, to the Metropolitan Detention Center ("MDC") in Brooklyn, New York,[9] where he was strip-searched and placed in solitary confinement. During his initial three days at MDC, Arar's continued requests to meet with a lawyer and make telephone calls were refused. (Id.)

On October 1, 2002,[10] the INS initiated removal proceedings against Arar, who was charged with being temporarily inadmissible because of his membership in al Qaeda, a group designated by the Secretary of State as a foreign terrorist organization. Upon being given permission to make one telephone call, Arar called his mother-in-law in Ottawa, Canada. (Id.)

Upon learning of Arar's whereabouts, his family contacted the Office for Consular Affairs ("Canadian Consulate")[11] and retained an attorney, Amal Oummih, to represent him. The Canadian Consulate had not been notified of Arar's detention. On October 3, 2002, Arar received a visit from Maureen Girvan from the Canadian Consulate, who, when presented with the document noting Arar's inadmissibility to the United States, assured Arar that removal to Syria was not an option. On October 4, 2002, Arar designated Canada as the country to which he wished to be removed. (Id.)

On October 5, 2002, Arar had his only meeting with

---

[9] This is the same federal jail in which, less than a year earlier, Javaid Iqbal was allegedly mistreated. Iqbal, a Muslim inmate accused of violations of 18 U.S.C. §§ 371 and 1028 (conspiracy to defraud the United States and fraud with identification) and held post-9/11 in the MDC, allegedly suffered "unconstitutional actions against him in connection with his confinement under harsh conditions . . . after separation from the general prison population." Iqbal, 490 F.3d at 147, 148 n.1. We held, with respect to Iqbal's subsequent Bivens actions, that such treatment was not protected, as a matter of law, under the doctrine of qualified immunity. Id. at 177-78.

[10] Five days after Arar's arrival in the United States.

[11] In New York City.

counsel.  The following day, he was taken in chains and shackles to a room where approximately seven INS officials questioned him about his reasons for opposing removal to Syria.  His attorney was not provided advance notice of the interrogation, and Arar further alleges that U.S. officials misled him into thinking his attorney had chosen not to attend.  During the interrogation, Arar continued to express his fear of being tortured if returned to Syria.  At the conclusion of the six-hour interrogation, Arar was informed that the officials were discussing his case with "Washington, D.C."  Arar was asked to sign a document that appeared to be a transcript. He refused to sign the form.  (Id. at 253-54.)

The following day (October 7, 2002), attorney Oummih received two telephone calls informing her that Arar had been taken for processing to an INS office at Varick Street in Manhattan, that he would eventually be placed in a detention facility in New Jersey, and that she should call back the following morning for Arar's exact whereabouts.  However, Arar alleges that he never left the MDC and that the contents of both of these phone calls to his counsel were false and misleading.  (Id. at 254.)

That same day, October 7, 2002, the INS Regional Director, J. Scott Blackman, determined from classified and unclassified information that Arar is "clearly and unequivocally" a member of al Qaeda and, therefore, "clearly and unequivocally inadmissible to the United States" under 8 U.S.C. § 1182(a)(3)(B)(i)(V).  See Cplt. Ex. D. at 1, 3, 5.  Based on that finding, Blackman concluded "that there are reasonable grounds to believe that [Arar] is a danger to the security of the United

55

States." Id. at 6 (brackets in original). (Arar, 414 F. Supp. 2d at 254.)

At approximately 4:00 a.m. on October 8, 2002, Arar learned that, based on classified information, INS regional director Blackman had ordered that Arar be sent to Syria and that his removal there was consistent with Article Three of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). Arar pleaded for reconsideration but was told by INS officials that the agency was not governed by the "Geneva Conventions" and that Arar was barred from reentering the country for a period of five years and would be admissible only with the permission of the Attorney General. (Id.)

Later that day, Arar was taken in chains and shackles to a New Jersey airfield, where he boarded a small jet plane bound for Washington, D.C. From there, he was flown to Amman, Jordan, arriving there on October 9, 2002. He was then handed over to Jordanian authorities, who delivered him to the Syrians later that day. At this time, U.S. officials had not informed either Canadian Consulate official Girvan or attorney Oummih that Arar had been removed to Syria. Arar alleges that Syrian officials refused to accept Arar directly from the United States. (Id.)

Arar's Final Notice of Inadmissability ("Final Notice") ordered him removed without further inquiry before an immigration judge. See Cplt. Ex. D. According to the Final Notice: "The Commissioner of the Immigration and Naturalization Service has determined that your removal to Syria would be consistent with [CAT]." Id. It was dated October 8, 2002, and signed by Deputy

56

Attorney General Larry Thompson. After oral argument in the district court on the defendants' motions to dismiss, in a letter dated August 18, 2005, counsel for Arar clarified that Arar received the Final Notice within hours of boarding the aircraft taking him to Jordan. See Dkt. No. 93. (Arar, 414 F. Supp. 2d at 254.)

B. Arar's Detention in Syria

During his ten-month period of detention in Syria, Arar alleges, he was placed in a "grave" cell measuring six feet long, seven feet high, and three feet wide. The cell was located within the Palestine Branch of the Syrian Military Intelligence ("Palestine Branch"). The cell was damp and cold, contained very little light, and was infested with rats, which would enter the cell through a small aperture in the ceiling. Cats would urinate on Arar through the aperture, and sanitary facilities were nonexistent. Arar was allowed to bathe himself in cold water once per week. He was prohibited from exercising and was provided barely edible food. Arar lost forty pounds during his ten-month period of detention in Syria. (Id.)

During his first twelve days in Syrian detention, Arar was interrogated for eighteen hours per day and was physically and psychologically tortured. He was beaten on his palms, hips, and lower back with a two-inch-thick electric cable. His captors also used their fists to beat him on his stomach, his face, and the back of his neck. He was subjected to excruciating pain and pleaded with his captors to stop, but they would not. He was placed in a room where he could hear the screams of other detainees being

57

tortured and was told that he, too, would be placed in a spine-breaking "chair," hung upside down in a "tire" for beatings, and subjected to electric shocks.  To lessen his exposure to the torture, Arar falsely confessed, among other things, to having trained with terrorists in Afghanistan, even though he had never been to Afghanistan and had never been involved in terrorist activity.  (Id. at 255.)

Arar alleges that his interrogation in Syria was coordinated and planned by U.S. officials, who sent the Syrians a dossier containing specific questions.  As evidence of this, Arar notes that the interrogations in the United States and Syria contained identical questions, including a specific question about his relationship with a particular individual wanted for terrorism.  In return, the Syrian officials supplied U.S. officials with all information extracted from Arar; plaintiff cites a statement by one Syrian official who has publicly stated that the Syrian government shared information with the United States that it extracted from Arar.  See Cplt. Ex. E (January 21, 2004 transcript of CBS's Sixty Minutes II: "His Year In Hell").  (Arar, 414 F. Supp. 2d at 255.)

C. Arar's Contact with the Canadian Government
   While Detained in Syria

The Canadian Embassy contacted the Syrian government about Arar on October 20, 2002, and the following day, Syrian officials confirmed that they were detaining him.  At this point, the Syrian officials ceased interrogating and torturing Arar.  (Id.)

Canadian officials visited Arar at the Palestine Branch five times during his ten-month detention. Prior to each visit, Arar was warned not to disclose that he was being mistreated. He complied but eventually broke down during the fifth visit, telling the Canadian consular official that he was being tortured and kept in a grave. (Id.)

Five days later, Arar was brought to a Syrian investigation branch, where he was forced to sign a confession stating that he had participated in terrorist training in Afghanistan even though, Arar states, he has never been to Afghanistan or participated in any terrorist activity. Arar was then taken to an overcrowded Syrian prison, where he remained for six weeks. (Id.)

On September 28, 2003, Arar was transferred back to the Palestine Branch, where he was held for one week. During this week, he heard other detainees screaming in pain and begging for their torture to end. (Id.)

On October 5, 2003, Syria, without filing any charges against Arar, released him into the custody of Canadian Embassy officials in Damascus. He was flown to Ottawa the following day and reunited with his family. (Id.)

Arar contends that he is not a member of any terrorist organization, including al Qaeda, and has never knowingly associated himself with terrorists, terrorist organizations or terrorist activity. Arar claims that the individual about whom he was questioned was a casual acquaintance whom Arar had last seen in October 2001. He believes that he was removed to Syria for

59

interrogation under torture because of his casual acquaintances with this individual and others believed to be involved in terrorist activity.  But Arar contends "on information and belief" that there has never been, nor is there now, any reasonable suspicion that he was involved in such activity.[12]  Cplt. ¶ 2. (Arar, 414 F. Supp. 2d at 255-56.)

Arar alleges that he continues to suffer adverse effects from his ordeal in Syria.  He claims that he has trouble relating to his wife and children, suffers from nightmares, is frequently branded a terrorist, and is having trouble finding employment due to his reputation and inability to travel in the United States. (Id. at 256.)

D.  U.S. Policy Related to Interrogation
    of Detainees by Foreign Governments

The complaint alleges on information and belief that Arar was removed to Syria under a covert U.S. policy of "extraordinary rendition," according to which individuals are sent to foreign countries to undergo methods of interrogation not permitted in the United States.  The "extraordinary rendition" policy involves the removal of "non-U.S. citizens detained in this country and elsewhere and suspected -- reasonably or unreasonably -- of terrorist activity to countries, including Syria, where interrogations under torture are routine."  Cplt. ¶ 24.  Arar alleges on information and belief that the United States sends

---

[12] Footnote in district court opinion, relating to the so-called "LaHood Letter" about a subsequent Canadian inquiry, omitted.  See Arar, 414 F. Supp. 2d at 256 n.1.

individuals "to countries like Syria precisely because those countries can and do use methods of interrogation to obtain information from detainees that would not be morally acceptable or legal in the United States and other democracies." Id. The complaint further alleges that the defendants "have facilitated such human rights abuses, exchanging dossiers with intelligence officials in the countries to which non-U.S. citizens are removed." Id. The complaint also alleges that the United States involves Syria in its "extraordinary rendition" program to extract counter-terrorism information. (Arar, 414 F. Supp. 2d at 256.)

This "extraordinary rendition" program is not part of any official or declared U.S. public policy; nevertheless, it has received extensive attention in the press, where unnamed U.S. officials and certain foreign officials have admitted to the existence of such a policy. Arar details a number of articles in the mainstream press recounting both the incidents of this particular case and the "extraordinary rendition" program more broadly. These articles are attached as Exhibit C of his complaint. (Id. at 256-57.)

Arar alleges that the defendants directed the interrogations by providing information about Arar to Syrian officials and receiving reports on Arar's responses. Consequently, the defendants conspired with, and/or aided and abetted, Syrian officials in arbitrarily detaining, interrogating, and torturing Arar. Arar argues in the alternative that, at a minimum, the defendants knew or at least should have known that there was a substantial likelihood that he would be tortured upon his removal

61

to Syria.  (Id. at 257.)

E.  Syria's Human Rights Record

Arar's claim that he faced a likelihood of torture in Syria is supported by U.S. State Department reports on Syria's human rights practices.  See, e.g., Bureau of Democracy, Human Rights, and Labor, United States Department of State, 2004 Country Reports on Human Rights Practices (Released February 28, 2005) ("2004 Report").  According to the State Department, Syria's "human rights record remained poor, and the Government continued to commit numerous, serious abuses . . . includ[ing] the use of torture in detention, which at times resulted in death."  Id. at 1.  Although the Syrian constitution officially prohibits such practices, "there was credible evidence that security forces continued to use torture frequently."  Id. at 2.  The 2004 Report cites "numerous cases of security forces using torture on prisoners in custody."  Id. Similar references throughout the 2004 Report, as well as State Department reports from prior years, are legion.  See, e.g., Cplt. Ex. A (2002 State Department Human Rights Report on Syria).  (Arar, 414 F. Supp. 2d at 257.)[13]

F.  The Canadian Government Inquiry

On September 18, 2006, a Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar ("Arar Commission"), established by the government of Canada to investigate the Arar affair, issued a three-volume report.  See

---

[13] The district court's description of the facts as alleged in the complaint ends here.

Arar Comm'n, Report of the Events Relating to Maher Arar (2006).[14] A press release issued by the Commission summarized: **"On Maher Arar** the Commissioner [Dennis O'Connor] comes to one important conclusion: 'I am able to say categorically that there is no evidence to indicate that Mr. Arar has committed any offence or that his activities constitute a threat to the security of Canada.'" Press Release, Arar Comm'n, Arar Commission Releases Its Findings on the Handling of the Maher Arar Case 1 (Sept. 18, 2006) (boldface in original), available at http://www.ararcommission.ca/eng/ReleaseFinal_Sept18.pdf (last visited May 31, 2008). On January 26, 2007, the Office of the Prime Minister of Canada issued the following announcement:

> Prime Minister Stephen Harper today released the letter of apology he has sent to Maher Arar and his family for any role Canadian officials may have played in what happened to Mr. Arar, Monia Mazigh and their family in 2002 and 2003.

> "Although the events leading up to this terrible ordeal happened under the previous government, our Government will do everything in its power to ensure that the issues raised by Commissioner O'Connor are addressed," said the Prime Minister. "I sincerely hope that these actions will help Mr. Arar and his family

---

[14] On October 23, 2007, this Court granted Arar's motion to take judicial notice of the Report insofar as its existence and the scope of its contents were concerned, but denied the motion insofar as it may have sought judicial notice of the facts asserted in the report. But cf. ante at **[4-5]** (employing the report as the source for facts relating to Canadian involvement in the Arar incident).

begin a new and hopeful chapter in their lives."

Canada's New Government has accepted all 23 recommendations made in Commissioner O'Connor's first report, and has already begun acting upon them.  The Government has sent letters to both the Syrian and the U.S. governments formally objecting to the treatment of Mr. Arar. Ministers Day and MacKay have also expressed Canada's concerns on this important issue to their American counterparts.  Finally, Canada has removed Mr. Arar from Canadian lookout lists, and requested that the United States amend its own records accordingly.

The Prime Minister also announced that Canada's New Government has successfully completed the mediation process with Mr. Arar, fulfilling another one of Commissioner O'Connor's recommendations.  This settlement, mutually agreed upon by all parties, ensures that Mr. Arar and his family will obtain fair compensation, in the amount of $10.5 million, plus legal costs, for the ordeal they have suffered.

Press Release, Prime Minister Releases Letter of Apology to Maher

Arar and His Family and Announces Completion of Mediation Process (Jan. 26, 2007), available at http://pm.gc.ca/eng/media. asp?id=1509 (last visited May 31, 2008); see also Margaret L. Satterthwaite, Rendered Meaningless: Extraordinary Rendition and the Rule of Law, 75 Geo. Wash. L. Rev. 1333, 1339-40 (2007).

### III. PROCEDURAL HISTORY

A. The Complaint and the District Court's Opinion

On January 22, 2004, Arar filed a complaint in the United States District Court for the Eastern District of New York. In addition to its factual allegations, his complaint asserts as "Claims for Relief":

1. That defendants, in contravention of the Torture Victim Prevention Act of 1991 ("TVPA"), 28 U.S.C. § 1350 (note), acted in concert with Jordanian and Syrian officials, and under color of Syrian law, to conspire and/or aid and abet in violating his right to be free from torture (Count 1).

2. That defendants knowingly or recklessly subjected him to torture and coercive interrogation in Syria in violation of his Fifth Amendment right to substantive due process (Count 2).

3. That defendants knowingly or recklessly

65

subjected him to arbitrary detention without trial in Syria in violation of his Fifth Amendment right to substantive due process (Count 3).

4. That defendants intentionally or recklessly subjected him to arbitrary detention and coercive and involuntary custodial interrogation in the United States, and interfered with his ability to obtain counsel or petition the courts for redress, in violation of his Fifth Amendment right to substantive due process (Count 4).

See Arar, 414 F. Supp. 2d at 257-58.

The district court denied Arar's claim for declaratory relief, dismissed Counts 1, 2, and 3 with prejudice, and dismissed Count 4 without prejudice and with leave to replead. Id. at 287-88. The district court decided that: 1) Arar lacks standing to bring a claim for declaratory relief; 2) Arar has no TVPA action since (a) in the court's view, Congress provided no private right of action under the TVPA for non-citizens such as Arar, and (b) he cannot show that defendants were acting under "color of law, of any foreign nation," id. at 287; 3) even though the Immigration and Nationality Act ("INA") does not foreclose jurisdiction over Arar's substantive due process claims, no cause of action under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388

66

(1971), can be extended in light of "special factors counselling hesitation in the absence of affirmative action by Congress," id. at 396, namely the national security and foreign policy considerations at stake; and 4) prior cases holding that inadmissible aliens deserve little due process protection are inapplicable to Arar's claim that he was deprived of due process during his period of domestic detention because Arar was not attempting to effect an entry into the United States, and therefore the circumstances and conditions of confinement to which Arar was subjected while in U.S. custody may potentially raise Bivens claims, but Arar was required to replead them without regard to any rendition claim and name those defendants that were personally involved in the alleged unconstitutional treatment. Arar, 414 F. Supp. 2d at 287-88.

Arar declined the district court's invitation to replead. Instead, he appeals from the judgment of the district court.

B. The Panel's Majority Opinion

The panel affirms the judgment of the district court as explained by the majority opinion. The majority concludes that (1) the allegations set forth in Arar's complaint are sufficient, at this early stage of the litigation, to establish personal jurisdiction over defendants not resident in New York, but (2) Arar has not established federal subject-matter jurisdiction over his claim for declaratory relief. Ante at **[7-8, 49-51]**. It concludes further that (3) Arar's allegations do not state a claim against the defendants for damages under the TVPA, and (4) we cannot provide Arar with a judicially created cause of action for damages

67

under the Fifth Amendment, pursuant to the Bivens doctrine.  Id. at **[7-8, 49-51]**.  Finally, having decided to dismiss the complaint on these grounds, the majority does not reach the question of whether the INA or the state-secrets privilege foreclose Arar's pursuit of this litigation.  Id. at **[49-50]**.

I agree with the majority's conclusions as to personal jurisdiction, Arar's request for a declaratory judgment, and his claim under the TVPA.  Unlike the majority, however, I conclude that Arar adequately pleads violations of his constitutional rights and is entitled to proceed with his claims for monetary damages under Bivens.  Finally, as Arar and the defendants agree, were the complaint reinstated and this matter remanded, as I think it should be, the district court could then consider the defendants' assertion of the "state-secrets privilege"[15] in the first instance, and limit discovery as is necessary to meet legitimate national security and related concerns.

### IV.  ANALYSIS

This is not an immigration case.  Contrary to the majority's analysis, Arar's allegations do not describe an action arising under or to be decided according to the immigration laws of the United States.  Arar did not attempt to enter the United States in any but the most trivial sense; he sought only to transfer through JFK Airport in order to travel from one foreign country to another.  He was initially interrogated by FBI agents, not INS officials; they sought to learn not about the bona fides of his

---

[15] See United States v. Reynolds, 345 U.S. 1 (1953); Zuckerbraun v. General Dynamics Corp., 935 F.2d 544 (2d Cir. 1991).

attempt to "enter" the United States, but about his alleged links to al Qaeda. The INS was not engaged in order to make a determination as to Arar's immigration status. The agency's principal involvement came after the FBI failed to obtain desired information from him, in order to facilitate his transfer to Syria so that he might be further held and questioned under torture.

This lawsuit is thus about the propriety and constitutionality of the manner in which United States law enforcement agents sought to obtain from Arar information about terrorism or terrorists which they thought -- wrongly as it turned out -- that he possessed. The majority goes astray when it accepts the defendants' attempt to cast it as an immigration matter.[16]

In my view, the issues raised on this appeal, approached in light of the case Arar actually seeks to assert, are relatively straightforward:

    1. What is the gravamen of Arar's complaint?

    2. Does it allege a deprivation of his right to substantive due process under the Fifth Amendment to the United States Constitution?

    3. If so, is a <u>Bivens</u> action available as a vehicle by which he may seek redress for the violation?

    4. And, if so, are the defendants entitled to qualified immunity?

A. The Gravamen of the Complaint

It is well-settled in this Circuit that "we may not affirm the dismissal of [a plaintiff's] complaint because [he has]

_____

[16] The district court, by contrast, did not treat this as an immigration case. <u>See</u> <u>Arar</u>, 414 F. Supp. 2d at 285, 287.

69

proceeded under the wrong theory 'so long as [he has] alleged facts sufficient to support a meritorious legal claim.'" Hack v. President & Fellows of Yale College, 237 F.3d 81, 89 (2d Cir. 2000) (quoting Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir. 1997)), cert. denied, 534 U.S. 888 (2001).  In considering an appeal such as this one from a district court's grant of the defendants' Rule 12(b)(6) motion to dismiss, "'[f]actual allegations alone are what matter[].'" Northrop, 134 F.3d at 46 (quoting Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (en banc) (citing Newman v. Silver, 713 F.2d 14, 15 n.1 (2d Cir. 1983))).[17]  We are, moreover, required to read the factual allegations in a complaint "as a whole." See Shapiro v. Cantor, 123 F.3d 717, 719 (2d Cir. 1997); see also Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1252 n.11 (11th Cir. 2005) (per curiam), cert. denied, 127 S. Ct. 596 (2006); Goldwasser v. Ameritech Corp., 222 F.3d 390, 401 (7th Cir. 2000).

The allegations contained in Arar's complaint include assertions, which must be treated as established facts for present purposes, that: 1) Arar was apprehended by government agents as he sought to change planes at JFK Airport; he was not seeking to enter the United States; 2) his detention, based on false information given by the government of Canada, was for the purpose of obtaining information from him about terrorism and his alleged links with terrorists and terrorist organizations; 3) he was interrogated

---

[17] The Federal Rules of Civil Procedure tell us that "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).  Wright and Miller's treatise counsels that "[t]his provision is not simply a precatory statement but reflects one of the basic philosophies of practice under the federal rules."  5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004).  "One of the most important objectives of the federal rules is that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully drawn." Id.

harshly on that topic -- mostly by FBI agents -- for many hours over a period of two days; 4) during that period, he was held incommunicado and was mistreated by, among other things, being deprived of food and water for a substantial portion of his time in custody; 5) he was then taken from JFK Airport to the MDC in Brooklyn, where he continued to be held incommunicado and in solitary confinement for another three days; 6) while at the MDC, INS agents sought unsuccessfully to have him agree to be removed to Syria because they and other U.S. government agents intended that he would be questioned there along similar lines, but under torture; 7) thirteen days after Arar had been intercepted and incarcerated at the airport, defendants sent him against his will to Syria. The defendants intended that he be questioned in Syria under torture and while enduring brutal and inhumane conditions of captivity. This was, as alleged, all part of a single course of action, conceived of and executed by the defendants in the United States. Its purpose: to make Arar "talk."

Not until deep in its opinion, though, does the majority come to address the heart of the matter: Arar's treatment by defendants while he was present in the United States. When it finally does, the opinion disposes of the issue by describing only some of the pleaded facts:  "[W]hile in the United States," it says, Arar "was subjected to 'coercive and involuntary custodial interrogations . . . conducted for excessively long periods of time and at odd hours of the day and night' on three occasions over thirteen days; 'deprived of sleep and food for extended periods of time'; and, thereafter, was 'held in solitary confinement, chained

71

and shackled, [and] subjected to [an] invasive strip-search[].'" Ante at **[45]**. Having thus limited its consideration to only a portion of the acts Arar complains of, the majority blandly concludes: "These allegations, while describing what might perhaps constitute relatively harsh conditions of detention, do not amount to a claim of gross physical abuse" necessary to support a conclusion that his due process rights had been infringed. Id. at **[45]**.

But the majority reaches its conclusion by eliding, among other things, the manner in which Arar was taken into custody and the manner in which defendants disposed of him when their efforts to obtain information from him here proved fruitless. Arar was, in effect, abducted while attempting to transit at JFK Airport. And when he failed to give defendants the information they were looking for, and he refused to be sent "voluntarily" to Syria, they forcibly sent him there to be detained and questioned under torture.

It is true that after setting forth his allegations of fact in detail in his complaint, Arar structures his "claims for relief" to charge knowing or reckless subjection to torture, coercive interrogation, and arbitrary detention in Syria (counts two and three) separately from, among other things, arbitrary detention and coercive and involuntary custodial interrogation in the United States (count four). See Arar, 414 F. Supp. 2d at 257-58. The pleading's form may have contributed to the majority's erroneous separation of the decision to send Arar to Syria to be interrogated under torture from his "domestic" physical

mistreatment. But, as noted, "'[f]actual allegations alone are what matter[].'" Northrop, 134 F.3d at 46 (quoting Albert, 851 F.2d at 571 n.3). The assessment of Arar's alleged complaint must take into account the entire arc of factual allegations that Arar makes -- his interception and arrest; his questioning, principally by FBI agents, about his putative ties to terrorists; his detention and mistreatment at JFK Airport in Queens and the MDC in Brooklyn; the deliberate misleading of both his lawyer and the Canadian Consulate; and his transport to Washington, D.C., and forced transfer to Syrian authorities for further detention and questioning under torture.

B. Arar's Pleading of a Substantive Due Process Violation

Principles of substantive due process apply only to a narrow band of extreme misbehavior by government agents acting under color of law: mistreatment of a person that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lombardi v. Whitman, 485 F.3d 73, 79 (2d Cir. 2007) (citations and internal quotation marks omitted). When Arar's complaint is read to include all of the actions allegedly taken by the defendants against him within this country, including the actions taken to send him to Syria with the intent that he be tortured there, it alleges conduct that easily exceeds the level of outrageousness needed to make out a due process claim. Indeed, although the "shocks the conscience" test is undeniably vague, see Estate of Smith v. Marasco, 430 F.3d 140, 156 (3d Cir. 2005); Schaefer v. Goch, 153 F.3d 793, 798 (7th Cir. 1998), "[n]o one doubts that under Supreme Court precedent, interrogation by

73

torture" meets that test, Harbury v. Deutch, 233 F.3d 596, 602 (D.C. Cir. 2000), rev'd on other grounds, 536 U.S. 403 (2002);[18] see also Rochin v. California, 342 U.S. 165, 172 (1952) (interrogation methods were "too close to the rack and the screw to permit of constitutional differentiation"); Palko v. Connecticut, 302 U.S. 319, 326 (1937) (noting that the Due Process Clause must at least "give protection against torture, physical or mental"), overruled on other grounds by Benton v. Maryland, 395 U.S. 784 (1969). The defendants did not themselves torture Arar; they "outsourced" it.[19] But I do not think that whether the defendants violated Arar's Fifth Amendment rights turns on whom they selected to do the torturing: themselves, a Syrian Intelligence officer, a warlord in Somalia, a drug cartel in Colombia, a military contractor in Baghdad or Boston, a Mafia family in New Jersey, or a Crip set in South Los Angeles.

We have held that under the state-created danger doctrine, "[w]here a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages." Lombardi, 485 F.3d at 80; see also, e.g., Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir. 1993) (finding liability where the police allegedly gave the green

---

[18] The Harbury court concluded, nonetheless, that because the murdered alien's mistreatment occurred entirely abroad, he had not suffered a violation of his Fifth Amendment rights. See Harbury, 233 F.3d at 603-04 (relying on United States v. Verdugo-Urquidez, 494 U.S. 259, 269 (1990)).

[19] "[R]endition -- the market approach -- outsources our crimes, which puts us at the mercy of anyone who can expose us, makes us dependent on some of the world's most unsavory actors, and abandons accountability. It is an approach we associate with crime families, not with great nations." Philip Bobbitt, Terror and Consent: The Wars for the Twenty-First Century 388 (2008). "[O]ne could get the worst of both worlds: national responsibility for acts as to which the agents we have empowered are unaccountable." Id. at 387.

74

light for skinheads to assault a group of flag-burners), overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); see also Velez-Diaz v. Vega-Irizarry, 421 F.3d 71, 79 (1st Cir. 2005) ("[I]n scenarios in which government officials actively direct or assist private actors in causing harm to an individual . . . the government officials and the private actor are essentially joint tortfeasors, and therefore, may incur shared constitutional responsibility." (citations and internal quotation marks omitted)). We have also held that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. Under these limited circumstances, the state may owe the incarcerated person an affirmative duty to protect against harms to his liberties inflicted by third parties." Matican v. City of New York, 524 F.3d 151, 155-56 (2d Cir. 2008) (citations, internal quotation marks, and footnotes omitted). This "duty arises solely from the State's affirmative act of restraining the individual's freedom to act on his own behalf through incarceration, institutionalization, or other similar restraint of personal liberty." Id.[20]

        The majority reaches the wrong conclusion in large measure, I think, by treating Arar's claims as though he were an unadmitted alien seeking entry into the United States. The majority asserts that "[a]s an unadmitted alien, Arar as a matter

---

[20] Accordingly, Arar's claim can be analyzed under either of the "two 'separate and distinct theories of liability' under the substantive component of the Due Process Clause: 'special relationship' liability or 'state-created-danger' liability." Benzman v. Whitman, 523 F.3d 119, 127 (2d Cir. 2008).

of law lacked a physical presence in the United States."  Ante at **[39]**.  And it concludes from this that "the full protections of the due process clause" do not apply to Arar because they "apply only to 'persons within the United States.'"  Id. (quoting Zadvydas v. Davis, 533 U.S. 678, 693 (2001) (internal quotation marks omitted)).

But the notion that, while in New York City, Arar was not "physically present" in the United States, is a legal fiction peculiar to immigration law.  It is relevant only to the determination of an alien's immigration status and related matters.  It is indeed a fiction that works largely to the benefit of aliens, permitting them to remain here while immigration officials determine whether they are legally admissible.

If Arar had been seeking to immigrate to the United States,[21] had he been detained at the immigration entry point at JFK Airport; had he thereafter been held at the MDC in Brooklyn pending deportation to his home in Canada, he presumably would have properly been treated, for immigration purposes, as though he had been held or turned back at the border.  See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 215 (1953) ("Aliens seeking entry obviously can be turned back at the border without

---

[21] While the majority opinion from time to time treats Arar as though he was an immigrant seeking entry into the United States, the INA makes a clear distinction between an immigrant seeking entry and an alien seeking only transit through the United States.  The INA excludes from the definition of "immigrant" an alien "in immediate and continuous transit through the United States."  8 U.S.C. § 1101(a)(15)(C).  Moreover, at the time Arar flew to JFK Airport, the United States had in place a Transit Without Visa program that allowed an alien who would be required to obtain a visa to enter the United States to transit through a U.S. airport without obtaining a visa.  As a citizen of Canada, a visa waiver country, Arar had no need to avail himself of this program.  But its existence demonstrates the distinction, recognized by the government, between transit passengers, like Arar, and immigrants seeking entry into the United States.  The program was suspended for security reasons on August 2, 2003, long after Arar's attempt to transit through JFK Airport.  See Press Release, Department of Homeland Security, Homeland Security and Department of State Take Immediate Steps To Make Air Travel Even Safer (Aug. 2, 2003), available at http://www.dhs.gov/xnews/releases/pressreleases0227.shtm (last visited May 30, 2008).

more. . . . [T]emporary harborage, an act of legislative grace, bestows no additional rights."); Kaplan v. Tod, 267 U.S. 228, 230 (1925) (concluding that an unadmitted alien held on Ellis Island, and later elsewhere within the United States, was "to be regarded as stopped at the boundary line" for naturalization purposes). But for purposes of assessing his treatment by law enforcement agents during his detention and interrogation in several places in the City of New York, it cannot follow from a legal fiction applicable to immigration status that Arar, rather like the fictional "little man who wasn't there,"[22] was never in this country.[23] Arar sought not to enter this country, but to leave it, after transiting briefly through one of its airports. For purposes of identifying the most rudimentary of his rights under the Constitution, the fiction that Arar was not here is senseless. He was here, as a matter of both fact and law, and was therefore entitled to protection against mistreatment under the Due Process Clause.

***

The majority acknowledges that even an unadmitted alien,

---

[22] Hughes Mearns, Antigonish (1899).

[23] The Supreme Court's decisions and our own invoke the entry fiction in cases related to the determination of an alien's immigration status, and the procedural due process to which an alien is entitled by virtue of that status, not cases adjudicating alleged violations of an alien's substantive due process rights during detention. See, e.g., Leng May Ma v. Barber, 357 U.S. 185 (1958) (concluding that temporary parole in United States while alien's admissibility was being determined did not entitle alien to benefit of statute giving Attorney General authority to withhold deportation of any alien "within the United States" if alien would thereby be subjected to physical persecution); Menon v. Esperdy, 413 F.2d 644, 647 (2d Cir. 1969) (noting that "since a parole does not constitute an admission into the United States . . . th[e] appeal involve[d] an exclusion . . . rather than an expulsion"); Dong Wing Ott v. Shaughnessy, 247 F.2d 769, 770 (2d Cir. 1957) (per curiam) (holding that the Attorney General's "discretionary power to suspend deportation" did not apply to aliens "within the country on parole," because parole, "by statute[, was] not [to] be regarded as an admission of the alien" (citation and internal quotation marks omitted)), cert. denied, 357 U.S. 925 (1958); Knauff v. Shaughnessy, 179 F.2d 628, 630 (2d Cir. 1950) (per curiam) (alien stopped at the border and detained on Ellis Island "is not 'in the United States' . . . [and therefore] is not entitled to naturalization"); see also Martinez-Aguero v. Gonzalez, 459 F.3d 618, 623 (5th Cir.) (rejecting application of the entry fiction to Bivens claims involving the use of excessive force), cert. denied, 127 S. Ct. 837 (2006); Kwai Fun Wong v. United States, 373 F.3d 952, 973 (9th Cir. 2004) ("The entry fiction is best seen . . . as a fairly narrow doctrine that primarily determines the procedures that the executive branch must follow before turning an immigrant away." (emphasis in original)).

treated under the immigration laws as though he was not physically present within the United States, has constitutional rights. The majority sees the scope of those rights as not extending "beyond" freedom from "gross physical abuse." See ante at **[47]**. I think that unduly narrow. It seems to me that Arar was entitled to the bare-minimum protection that substantive due process affords.

In support of applying a "gross physical abuse" standard, the majority cites Lynch v. Cannatella, 810 F.2d 1363, 1374 (5th Cir. 1987), Correa v. Thornburgh, 901 F.2d 1166, 1171 n.5 (2d Cir. 1990), and Adras v. Nelson, 917 F.2d 1552, 1559 (11th Cir. 1990). These cases are highly doubtful authority for present purposes. Again, they are immigration cases. They deal with the treatment of aliens who, having sought admission to the United States, were awaiting removal or a determination of their status under the immigration laws. It is difficult to understand the relevance of those decisions to the rights of an alien who wished to transit through an American airport but was taken into custody for interrogation as to non-immigration matters instead.

Even accepting these cases as setting forth the applicable standard, however, I think Arar adequately alleges a violation of his substantive due process rights. His allegations, properly construed, describe decisions made and actions taken by defendants within the United States, while Arar was in the United States, designed to obtain information from him, even if doing so ultimately required his detention and torture abroad. Once the defendants, having despaired of acquiring the information from Arar here, physically caused him to be placed in the hands of someone,

78

somewhere -- anyone, anywhere -- for the purpose of having him tortured, it seems to me that they were subjecting him to the most appalling kind of "gross physical abuse."[24]  They thereby violated his right to due process even as the majority artificially limits that right.

It may be worth noting, finally, that in order for one or more of the defendants to be liable for the infringement of Arar's substantive due process rights, that defendant or those defendants would presumably have to be found by the trier of fact to have participated in a broad enough swath of Arar's mistreatment to be held responsible for the violation.  A lone INS agent who asked Arar questions at JFK Airport on September 26, or the pilot of the airplane in which Arar was sent to Washington, D.C., en route to Jordan and Syria on October 8, would be unlikely to be liable to Arar for damages for their limited roles in the events.  Who, if anyone, fits that description, however, seems to me a question that cannot be addressed at this time, without the fruits of pre-trial discovery.

C.  Availability of a Bivens Action

In Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private right of action for damages against federal officers alleged to have violated a citizen's

---

[24] As the majority notes, Arar asserts that his substantive due process rights should be assessed under standards established for pre-trial detainees in Bell v. Wolfish, 441 U.S. 520, 539 (1979) (deciding whether the challenged conditions amount to "punishment that may not constitutionally be inflicted upon [pre-trial] detainees qua detainees"), Block v. Rutherford, 468 U.S. 576, 584 (1984), and Iqbal, 490 F.3d at 168-69.  See ante at **[45- 46]**.  I find such an analysis under these cases to be unhelpful.  The issue here is not whether Arar was "punished" as a pre-trial detainee without first being tried and convicted.  He was not a pre-trial detainee.  The question is whether, as a person detained in the United States for interrogation, he may be mistreated and sent to be tortured in the way that he was.

constitutional rights." Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001).[25] The Bivens Court permitted "a victim of a Fourth Amendment violation by federal officers [to] bring suit for money damages against the officers in federal court." Id.

I have no quarrel with much of what I take to be the majority's view of Bivens jurisprudence. The Supreme Court has indeed been most reluctant to "extend" use of the "Bivens model." Wilkie v. Robbins, 127 S. Ct. 2588, 2597 (2007). Since Bivens, the Court has "extended" its reach only twice -- to "recognize[] an implied damages remedy under the Due Process Clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, Carlson v. Green, 446 U.S. 14 (1980)." Malesko, 534 U.S. at 67; see also Wilkie, 127 S. Ct. at 2597-98.

The majority is also correct in observing that when determining whether to extend Bivens, i.e., whether "to devise a new Bivens damages action," Wilkie, 127 S. Ct. at 2597, a court must first determine whether Congress has provided "any alternative, existing process for protecting the interest" in question, id. at 2598. If no alternative remedial scheme exists, whether to provide "a Bivens remedy is a matter of judicial judgment." Id. "'[T]he federal courts must make the kind of remedial determination that is appropriate for a common-law

---

[25] Bivens thus gave persons whose constitutional rights were violated by federal officers a remedy roughly akin to that available under 42 U.S.C. § 1983 to persons aggrieved by the acts of state officers. Unlike a Bivens action, the remedy provided by section 1983 is statutory in nature. But that statute was virtually a dead letter until it was given life by an interpretation of the Supreme Court some ninety years after it was enacted. See Monroe v. Pape, 365 U.S. 167, 171-72 (1961) (concluding that what is now section 1983, derived from section 1 of the "Ku Klux Act" of 1871, provides for a cause of action against a state official acting under color of state law even if there is no authority under state law, custom, or usage for the state official to do what he or she did), overruled on other grounds by Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 663 (1978).

80

tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.'" Id. (quoting Bush v. Lucas, 462 U.S. 367, 378 (1983)).

But not every attempt to employ Bivens to redress asserted constitutional violations requires a separate and independent judicial inquiry as to whether the remedy is appropriate in that particular case. Only when the court is being asked "to devise a new Bivens damages action," id. at 2597 (emphasis added), do we make such an assessment. And a "new Bivens damages action" is not being sought unless the plaintiff is asking the court to "extend Bivens liability to a[] new context or new category of defendants." Malesko, 534 U.S. at 68.

In the case before us, Arar seeks to add no new category of defendants. Cf. Malesko, 534 U.S. 61 (refusing to extend Bivens to claims against private prisons); FDIC v. Meyer, 510 U.S. 471 (1994) (refusing to extend Bivens to claims against federal agencies). Indeed, it was recovery of damages incurred as a result of the violation of constitutional rights by federal agents and officials, such as the defendants here, for which the Bivens remedy was devised. See Malesko, 534 U.S. at 70 ("The purpose of Bivens is to deter individual federal officers from committing constitutional violations.").

We must ask, then, whether Arar seeks to extend Bivens liability into a new context and, if so, what that new context is. The task is complicated by the fact that the meaning that the Supreme Court ascribes to the term "new context" is not entirely

81

clear.  Compare Malesko, 534 U.S. at 67 (noting that Bivens was extended to a new context in Davis v. Passman, 442 U.S. 228 (1979), when the Court "recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment" (emphasis added)), with id. at 68 (describing Schweiker v. Chilicky, 487 U.S. 412 (1988), in which the plaintiffs sought damages under the Due Process Clause of the Fifth Amendment for errors made by federal officials in "in the[] handling [their] of Social Security applications," as describing a new context to which the Court declined to extend Bivens (emphasis added)).  The majority seems to be of the view that "new context" means a new set of facts, rather than a new legal context.  But every case we hear presents a new set of facts to which we are expected to apply established law.  Yet, each panel of this Court does not decide for itself, on an ad hoc basis, whether or not it is a good idea to allow a plaintiff, on the particular factual circumstances presented, to avail him or herself of a well-established remedy such as that afforded by Bivens.[26]  I therefore think that the word "context," as employed for purposes of deciding whether we are "devis[ing] a new Bivens damages action," Wilkie, 127 S. Ct. at 2597, is best understood to mean legal context -- in this case a substantive due process claim by a federal detainee -- and not, as the majority would have it, the fact-specific "context" of Arar's treatment, from his being taken

---

[26] Indeed, in those legal contexts where Bivens is well-established, courts do not conduct a fresh assessment as to whether a Bivens action is available based on the facts of each case. See, e.g., Groh v. Ramirez, 540 U.S. 551 (2004) (Bivens action for Fourth Amendment violation); McCarthy v. Madigan, 503 U.S. 140 (1992) (Bivens action for Eighth Amendment violation), superseded by statute on other grounds as stated in Booth v. Churner, 532 U.S. 731 (2001); Castro v. United States, 34 F.3d 106 (2d Cir. 1994) (Fourth Amendment); Armstrong v. Sears, 33 F.3d 182 (2d Cir. 1994) (same); Anderson v. Branen, 17 F.3d 552 (2d Cir. 1994) (same); Hallock v. Bonner, 387 F.3d 147 (2d Cir. 2004) (same), rev'd on other grounds, 546 U.S. 345 (2006).

into custody as a suspected member of al Qaeda to his being sent to Syria to be questioned under torture.

As far as I can determine, this Circuit has never explicitly decided whether a <u>Bivens</u> action can lie for alleged violations of substantive due process under the Fifth Amendment. But our cases imply that such a remedy is appropriate.

In <u>Iqbal</u>, for example, we considered a <u>Bivens</u> action brought on, <u>inter alia</u>, a Fifth Amendment substantive due process theory. The plaintiff alleged his physical mistreatment and humiliation, as a Muslim prisoner, by federal prison officials, while he was detained at the MDC. After concluding, on interlocutory appeal, that the defendants were not entitled to qualified immunity, we returned the matter to the district court for further proceedings. We did not so much as hint either that a <u>Bivens</u> remedy was unavailable or that its availability would constitute an unwarranted extension of the <u>Bivens</u> doctrine.[27] <u>Iqbal</u>, 490 F.3d at 177-78.

In any event, I see no reason why <u>Bivens</u> should not be available to vindicate Fifth Amendment substantive due process rights. As Judge Posner wrote for the Seventh Circuit with respect

---

[27] Shortly after we decided <u>Iqbal</u>, the Supreme Court made clear that by appealing from the district court's denial of qualified immunity, the defendants placed within our jurisdiction "the recognition of the entire cause of action." <u>Wilkie</u>, 127 S. Ct. at 2597 n.4. The district court in <u>Iqbal</u> had specifically rejected the defendants' argument that a <u>Bivens</u> action was unavailable. <u>Elmaghraby v. Ashcroft</u>, No. 04 CV 01809, 2005 WL 2375202, at *14, 2005 U.S. Dist. LEXIS 21434, *44-*45 (E.D.N.Y. Sept. 27, 2005). Thus, had we thought that no <u>Bivens</u> action was available, we had the power to resolve Iqbal's claims on that basis then. <u>Wilkie</u>, 127 S. Ct. at 2597 n.4.

See also <u>Thomas v. Ashcroft</u>, 470 F.3d 491 (2d Cir. 2006) (reversing district court's dismissal of <u>Bivens</u> action for violation of plaintiff's Fifth Amendment substantive due process rights while detained at the MDC); <u>Cuoco v. Moritsugu</u>, 222 F.3d 99 (2d Cir. 2000) (dismissing, on qualified immunity grounds, plaintiff's substantive due process <u>Bivens</u> claim against federal prison officials, without questioning whether a cause of action was available); <u>Li v. Canarozzi</u>, 142 F.3d 83 (2d Cir. 1998) (affirming judgment following jury verdict for the defendants in substantive due process <u>Bivens</u> action based on allegations of abuse by a prison guard at the federal Metropolitan Correctional Center in New York City).

to a Bivens action:

> [I]f ever there were a strong case for 'substantive due process,' it would be a case in which a person who had been arrested but not charged or convicted was brutalized while in custody. If the wanton or malicious infliction of severe pain or suffering upon a person being arrested violates the Fourth Amendment –– as no one doubts –– and if the wanton or malicious infliction of severe pain or suffering upon a prison inmate violates the Eighth Amendment –– as no one doubts –– it would be surprising if the wanton or malicious infliction of severe pain or suffering upon a person confined following his arrest but not yet charged or convicted were thought consistent with due process.

Wilkins v. May, 872 F.2d 190, 194 (7th Cir. 1989), cert. denied, 493 U.S. 1026 (1990);[28] accord Magluta v. Samples, 375 F.3d 1269 (11th Cir. 2004) (reversing district court's dismissal of pretrial detainee's Bivens action alleging unconstitutional conditions of confinement at federal penitentiary in violation of the Due Process Clause of the Fifth Amendment); Cale v. Johnson, 861 F.2d 943, 946-47 (6th Cir. 1988) (concluding that "federal courts have the jurisdictional authority to entertain a Bivens action brought by a federal prisoner, alleging violations of his right to substantive due process"), abrogated on other grounds by Thaddeus-X v. Blatter, 175 F.3d 378, 387-88 (6th Cir. 1999); see also Sell v. United States, 539 U.S. 166, 193 (Scalia, J., dissenting) (observing, in dissent, that "a [Bivens] action . . . is available to federal pretrial detainees challenging the conditions of their confinement"

---

[28] Although there is some disagreement in the Circuits regarding precisely when, following arrest, abuse of detained persons is to be analyzed under principles of substantive due process, we think Wilkins' comment as to why those principles must apply at some point is insightful and remains valid.

(citing <u>Lyons v. U.S. Marshals</u>, 840 F.2d 202 (3d Cir. 1988)).[29]

A federal inmate serving a prison sentence can employ <u>Bivens</u> to seek damages resulting from mistreatment by prison officials. <u>Carlson v. Green</u>, 446 U.S. 14 (1980). It would be odd if a federal detainee not charged with or convicted of any offense could not bring an analogous claim.[30]

\*\*\*

Even if "new context" for <u>Bivens</u> purposes does mean a new set of facts, however, and even if <u>Iqbal</u>, despite its factual and legal similarities, does not foreclose the notion that the facts of this case are sufficiently new to present a "new context," I think the majority's conclusion is in error.

The majority, applying the first step of the <u>Bivens</u> inquiry, argues that the INA provided an alternative remedial scheme for Arar. <u>Ante</u> at **[31-33]**. The district court correctly noted to the contrary that "Arar alleges that his final order of removal was issued moments before his removal to Syria, which suggests that it may have been unforeseeable or impossible to successfully seek a stay, preserving Arar's procedural rights under the INA." <u>Arar</u>, 414 F. Supp. 2d at 280. Nonetheless, the majority ultimately finds that this claim of official interference does not

---

[29] While cases permitting pre-trial detainees to bring <u>Bivens</u> actions for violations of their substantive due process rights support the <u>availability</u> of a <u>Bivens</u> action here, Arar's substantive due process claim should not be evaluated under the <u>standard</u> for assessing the claims of persons who, unlike Arar, were detained pre-trial rather than for the purpose of interrogation. <u>See</u> <u>supra</u> **[note 24]**. <u>Cf.</u> <u>ante</u> at **[46 n.29]**.

[30] We have not been asked by the parties to examine the possibility that Arar has pleaded facts sufficient to raise a claim under theories other than substantive due process -- such as under the Fourth Amendment, the self-incrimination clause of the Fifth Amendment, or even the Eighth Amendment. Because this is an appeal from a dismissal on the <u>facts</u> pleaded in the complaint under Rule 12(b)(6), I think that even if this Court were to consider such an alternate theory and conclude that it was valid, the case would be subject to remand to the district court for further proceedings on that theory. <u>See</u> section IV.A, <u>supra</u>.

85

exclude the INA as providing an alternative remedial scheme. It relies on Bishop v. Tice, 622 F.2d 349 (8th Cir. 1980), which, it says, stands for the proposition that "federal officials who interfere[] with a plaintiff's access to an exclusive remedial scheme c[an], pursuant to Bivens, be held liable for that interference inasmuch as it violated due process, but c[an] not be sued for the underlying injury that the remedial scheme was designed to redress." Ante at **[31-32]**.

Arar is not, however, seeking relief for the underlying injury that the INA was designed to redress. As the majority recognizes, ante at **[49]**, he is not challenging his removal order. Nor is he questioning this country's ability, however it might limit itself under its immigration laws, to remove an alien under those laws to a country of its choosing. He is challenging the constitutionality of his treatment by defendant law-enforcement officers while he was in detention in the United States.[31] For allegations of this sort, the INA offers no mechanism for redress. As the district court noted correctly:

> [T]he INA deals overwhelmingly with the admission, exclusion and removal of aliens –– almost all of whom seek to remain within this country until their claims are fairly resolved. That framework does not automatically lead to an adequate and meaningful remedy for the conduct alleged here.

---

[31] Arar raises an actionable claim under Bivens for constitutional violations incurred at the hands of federal officials during his detention in the United States. The district court had jurisdiction over Arar's claims pursuant to 28 U.S.C. § 1331, and we have appellate jurisdiction under 28 U.S.C. § 1291. See Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001); Macias v. Zenk, 495 F.3d 37, 40 (2d Cir. 2007). Because Arar is not challenging his removal order, see ante at **[49]**, the jurisdiction-stripping provision of the INA, 8 U.S.C. § 1252(a)(2)(B)(ii) (providing that "no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified . . . to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of [asylum]") does not apply.

*Arar*, 414 F. Supp. 2d at 280.[32]

The majority also errs, I think, in concluding that "special factors" counsel against the application of *Bivens* here. *Ante* at **[33-38]**. The majority dwells at length on the implications of Arar's *Bivens* claim for diplomatic relations and foreign policy. See *ante* at **[33-38]**.

Any legitimate interest that the United States has in shielding national security policy and foreign policy from intrusion by federal courts, however, would be protected by the proper invocation of the state-secrets privilege. The majority says that the "government's assertion of the state-secrets privilege . . . constitutes a . . . special factor counseling this Court to hesitate before creating a new [*Bivens* action]." *Ante* at **[36-37]**. But as the majority earlier acknowledges, "[o]nce properly invoked, the effect of the [state-secrets] privilege is to exclude [privileged] evidence from the case." *Ante* at **[12 n.4]** (citing *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991)).

Moreover, the state-secrets privilege is a narrow device that must be specifically invoked by the United States and

---

[32] The majority says that its holding is limited to the conclusion that, "barring further guidance from the Supreme Court . . . a *Bivens* remedy is unavailable for claims 'arising from any action taken or proceeding brought to remove an alien from the United States under' the authority conferred upon the Attorney General and his delegates by the INA." *Ante* at **[38]** (quoting 8 U.S.C. § 1252(b)(9)). But this is not an immigration case and it seems to me that "the authority conferred upon the Attorney General and his delegates by the INA" is therefore not relevant to the *Bivens* question presented. The majority offers no view as to whether a substantive due process *Bivens* action is available to detained persons generally. I cannot ultimately tell, then, what the majority's view would be as to Arar's ability to avail himself of *Bivens* if we were to treat this case, as I think we must, as a claim that law enforcement officials abused their authority under color of federal law rather than a case arising under and governed by immigration law.

established by it on a case-by-case basis.  See Zuckerbraun, 935 F.2d at 546 ("The privilege may be invoked only by the government and may be asserted even when the government is not a party to the case.").  That seems far preferable to the majority's blunderbuss solution -- to withhold categorically the availability of a Bivens cause of action in all such cases -- and the concomitant additional license it gives federal officials to violate constitutional rights with virtual impunity.  Rather than counseling against applying Bivens, the availability to the defendants of the state-secrets privilege counsels permitting a Bivens action to go forward by ensuring that such proceedings will not endanger the kinds of interests that properly concern the majority.

The majority reaches its conclusion, moreover, on the basis of the proposition that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative . . . Departments of the Government," ante at **[37]** (citing First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 766 (1972) (plurality opinion)).  But there is a long history of judicial review of Executive and Legislative decisions related to the conduct of foreign relations and national security.  See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."); Mitchell v. Forsyth, 472 U.S. 511, 523 (1985) ("[D]espite our recognition of the importance of [the Attorney General's

88

activities in the name of national security] to the safety of our Nation and its democratic system of government, we cannot accept the notion that restraints are completely unnecessary."); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426 (1934) ("[E]ven the war power does not remove constitutional limitations safeguarding essential liberties."). As the Supreme Court observed in Baker v. Carr, 369 U.S 186 (1962), "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Id. at 211; see also Brief of Retired Federal Judges as Amici Curiae at 11 ("The Supreme Court has made clear that the Executive's power to protect national security or conduct foreign affairs does not deprive the judiciary of its authority to act as a check against abuses of those powers that violate individual rights.").

                    * * *

        The alleged intentional acts which resulted in Arar's eventual torture and inhumane captivity were taken by federal officials while the officials and Arar were within United States borders, and while Arar was in the custody of those federal officials.[33] He therefore presents this Court with a classic, or at the very least viable, Bivens claim -- a request for damages

_____

[33] Irrespective of what ultimately happened to Arar abroad, the actions that he challenges were perpetrated by U.S. agents entirely within the United States. This case is thus decisively different from United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), where the allegedly unconstitutional conduct, an illegal search and seizure, took place in Mexico. It is similarly different from Johnson v. Eisentrager, 339 U.S. 763 (1950), which held that "(a) . . . an enemy alien; (b) [who] has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and [wa]s at all times imprisoned outside the United States" did not have a right to seek a writ of habeas corpus from the courts of the United States on the grounds that, inter alia, his Fifth Amendment rights had been violated. Id. at 777. Eisentrager remains good law for the proposition that there is "no authority . . . for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses," id. at 783. But that proposition is not inconsistent with any principle that Arar asserts or that this dissent embraces or applies.

incurred as a result of violations of his Fifth Amendment substantive due process rights by federal officials while they detained him.

D.  Qualified Immunity

Having thus found that Arar makes out an actionable claim under Bivens, we must analyze whether the defendants are entitled to qualified immunity.  In Iqbal, we set forth the elements of qualified immunity review:

> The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right.  If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action -- that is, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law.

Iqbal, 490 F.3d at 152 (citations and internal quotation marks omitted).  For the reasons set forth above, I have little doubt as to step one:  The facts as alleged constitute a violation of Arar's constitutional rights.

We must therefore ask whether these rights were clearly established at the time of their violation.  In Iqbal, as already noted above, "[w]e . . . recognize[d] the gravity of the situation that confronted investigative officials of the United States as a consequence of the 9/11 attacks.  We also recognize[d] that some forms of governmental action are permitted in emergency situations that would exceed constitutional limits in normal times."  Iqbal,

90

490 F.3d at 159. But we said that the right to substantive due process -- including "the right not to be subjected to needlessly harsh conditions of confinement, the right to be free from the use of excessive force, and the right not to be subjected to ethnic or religious discrimination" -- "do[es] not vary with surrounding circumstances." Id. "The strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times." Id. We said nothing to indicate that this notion was novel at the time of Iqbal's alleged mistreatment; neither was it at the time of Arar's some months later.

The question here is whether the treatment that Arar received at the hands of the defendants in order to coerce him to "talk" would be understood by a reasonable officer to be beyond the constitutional pale. We need not recite the facts as alleged yet again in order to conclude that they would have been. "No one doubts that under Supreme Court precedent, interrogation by torture like that alleged by [the plaintiff] shocks the conscience," Harbury, 233 F.3d at 602, and would therefore constitute a violation of the plaintiff's Fifth Amendment right to substantive due process if perpetrated directly by the defendants, cf. Chavez v. Martinez, 538 U.S. 760, 773 (2003) (plurality opinion) (stating that the Due Process Clause would "provide relief in appropriate circumstances" for "police torture or other abuse").

I think it would be no less "clear to a reasonable officer" that attempting, however unsuccessfully, to obtain information from Arar under abusive conditions of confinement and

interrogation, and then outsourcing his further questioning under torture to the same end, is "unlawful." The defendants here had "fair warning that their alleged treatment of [Arar] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002). I would therefore conclude that they are not entitled to qualified immunity at this stage of the proceedings.

It may seem odd that after all the deliberation that has been expended in deciding this case at the trial and appellate levels, I can conclude that the constitutional violation is clear. But it is the availability of a Bivens action that has been the focus of controversy. Perhaps no federal agent could foretell that he or she would be subject to one. That, though, is not the question. The question is whether the unconstitutional nature of the conduct was clear. I think that it was.

E.   Summary

In my view, then:

First, Arar's factual allegations -- beginning with his interception, detention, and FBI interrogation at JFK Airport, and continuing through his forced transportation to Syria in order that he be questioned under torture -- must be considered in their entirety and as a whole.

Second, that conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lombardi, 485 F.3d at 79 (citations and internal quotation marks omitted). Arar therefore alleges a violation of his right to substantive due process.

Third, he may seek to recover the damages allegedly thus

92

incurred in a <u>Bivens</u> action.

Finally, although a reasonable government official may have wondered whether a <u>Bivens</u> action was available as a means for Arar to redress his rights allegedly infringed, insofar as any one of them was responsible for his treatment as a whole, he or she could not have reasonably thought that his or her behavior was constitutionally permissible and is therefore not entitled to qualified immunity, at least at this stage of the proceedings.

The defendants' actions as alleged in the complaint, considered together, constitute a violation of Arar's Fifth Amendment right to substantive due process committed by government agents acting in the United States under color of federal authority. Whether Arar can establish, even in the teeth of the state-secrets doctrine, properly applied, the truth of the allegations of his mistreatment (including causation and damages), should be tested in discovery proceedings, at the summary-judgment phase, and perhaps at trial.

## V. CONCLUDING OBSERVATION

I have no reason whatever to doubt the seriousness of the challenge that terrorism poses to our safety and well-being. <u>See generally</u>, <u>e.g.</u>, Philip Bobbitt, <u>Terror and Consent: The Wars for the Twenty-First Century</u> (2008). During another time of national challenge, however, Justice Jackson, joined by Justice Frankfurter, dissented from the Supreme Court's decision that the due process rights of an unadmitted alien were not violated when he was kept indefinitely on Ellis Island without a hearing. <u>See</u> <u>Shaughnessy v. United States ex rel. Mezei</u>, 345 U.S. 206 (1953). The alien's

93

entry had been determined by the Attorney General to "be prejudicial to the public interest for security reasons," id. at 208, and he had therefore been excluded from the United States. Although Mezei was an immigration case with little bearing on the matter before us today, Justice Jackson's observations then, at a time when we thought ourselves in imminent and mortal danger from international Communism, see, e.g., United States v. Dennis, 183 F.2d 201, 213 (2d Cir. 1950) (L. Hand, J.), aff'd, 341 U.S. 494 (1951), are worth repeating now:

> The Communist conspiratorial technique of infiltration poses a problem which sorely tempts the Government to resort to confinement of suspects on secret information secretly judged. I have not been one to discount the Communist evil. But my apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else.

Shaughnessy, 345 U.S. at 227 (Jackson, J., dissenting).[34]

When it came to protection of the United States from then-perceived threats from abroad, Jackson was no absolutist. See American Communications Ass'n v. Douds, 339 U.S. 382, 422-52 (1950) (Jackson, J., concurring in part and dissenting in part) (addressing the threat of international Communism); Terminiello v. City of Chicago, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting) (warning that if "if the Court does not temper its doctrinaire

---

[34] The Supreme Court very recently observed:

> Security depends upon a sophisticated intelligence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint . . . .

Boumediene v. Bush, No. 06-1195, slip op. at 68-69, 2008 U.S. LEXIS 4887, at *127, 2008 WL 2369628, at *46 (U.S. June 12, 2008).

logic [as to freedom of speech] with a little practical wisdom," there is a danger that "it will convert the constitutional Bill of Rights into a suicide pact").  But with respect to the government's treatment of Mr. Mezei, he concluded:  "It is inconceivable to me that this measure of simple justice and fair dealing would menace the security of this country.  No one can make me believe that we are that far gone."  Shaughnessy, 345 U.S. at 227 (Jackson, J., dissenting).  I think Justice Jackson's observations warrant careful consideration at the present time and under present circumstances.